**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Steven A. KUNA, Jr.,
Defendant-Appellant.**

**No. 84–2328.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 25, 1985.
Decided April 25, 1985.

Lawrence Rosenthal, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Jeffrey R. Liebman, Arvey, Hodes, Costello & Burman, Chicago, Ill., for defendant-appellant.

Before BAUER and WOOD, Circuit Judges, and DOYLE, Senior District Judge.*

BAUER, Circuit Judge.

In June 1984, after a bench trial in the Northern District of Illinois, the district court convicted Steven A. Kuna of five counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of making a false statement to the Securities & Exchange Commission (SEC) in violation of 18 U.S.C. § 1001. Kuna appeals, arguing that during trial the district court constructively amended the mail fraud counts in violation of the fifth and sixth amendments, that the evidence was insufficient to support either the mail fraud counts or the false statement count, and that the district court improperly imposed restitution as a condition of probation on the false statement count. We affirm Kuna's conviction, but vacate the condition of probation requiring restitution and remand to the district court for resentencing.

I.

The facts, as shown by the government at trial, reveal that from July 1979 through December 1979, Kuna and John DeLeeuw solicited Michigan residents to invest in Steve Kuna & Associates (Associates), a limited partnership which was to be formed to engage in business as a "market-maker/specialist" on the Chicago Board Options Exchange (CBOE). Kuna & De-Leeuw were the general partners of Associates; Kuna was the managing general partner. Eventually over thirty investors invested approximately $1.3 million in Associates. The $1.3 million was placed in an escrow account at the Michigan National Bank (MNB), with which Kuna had executed an escrow agreement before soliciting investors. The terms of the escrow agreement provided that the offering proceeds were to be held in escrow until the conditions listed on the offering memorandum were satisfied. The offering memorandum had provided that the offering proceeds would be held in escrow until at least $600,000 had been deposited, until Associates was registered as a broker-dealer with the SEC and the Michigan Securities Bureau (MSB), and until Associates was approved for CBOE membership. The offering memorandum did describe the investment as involving a "high degree of risk," but it also stated an intention to use trading strategies that would minimize the risk of loss. In his oral representations to po-

* Honorable James E. Doyle, Senior District Judge for the Western District of Wisconsin, is sitting by designation.

tential investors, Kuna described the investment as a conservative one.

In December 1979, MNB transferred the offering proceeds to Continental Bank in Chicago, following receipt of a letter from MSB granting permission to release the funds. At the time, however, Associates had not applied for registration with the SEC nor had it applied for membership with the CBOE. On December 19, 1979, Kuna applied to the CBOE stating that he was a sole proprietor and would be trading with his own funds. He entered into an agreement to clear his trades with First Options of Chicago, Inc. in his own name on January 25, 1980. On January 30, 1980, he began trading on the CBOE in his own name but with Associates's funds. On February 19, 1980, Kuna applied for registration with the SEC as a broker-dealer stating that he would be trading as a sole proprietor with his own funds.

During the time that Kuna was trading on the CBOE with Associates's funds, he provided his limited partners with monthly reports which included a figure representing the monthly net liquidating balances in Associates' account. These monthly reports were mailed out on the letterhead of Doherty Zable & Co., a Chicago accounting firm. The figures supplied to Doherty Zable by Kuna were false. Kuna stipulated at trial to the actual net liquidating balances in the First Options account.[1]

In July 1980, the CBOE became aware that Kuna was trading with partnership funds and that he had failed to disclose on his CBOE application the fact that he had previously been sanctioned by the National Association of Securities Dealers. Kuna then applied for CBOE membership on behalf of Associates on July 31, 1980. The CBOE permitted Kuna to resume trading

only if he advised his investors of his previous failure to properly obtain CBOE membership. Kuna sent a letter telling investors that Associates had failed to comply with certain technical registration problems, but that the problem had been rectified.

Kuna resumed trading in October 1980, and proceeded to lose all of Associates' money in high risk trading. On November 17, 1980, First Options froze Associates's account and proceeded to liquidate it; Kuna informed DeLeeuw that he had lost all the partnership money and admitted to DeLeeuw and to Associates' attorney and accountant that he had supplied the partners with false financial information.

During November 1983, the grand jury returned a fifteen count indictment against Kuna. After a bench trial, the district court acquitted Kuna on counts one through five, which charged mail fraud involving the mailings of the monthly reports for March, May, June and July 1980. The court convicted Kuna on counts six through ten, which charged mail fraud involving the mailings of the monthly reports for August, September and October, 1980. The court also convicted Kuna on count fifteen, involving the false statement to the SEC. The court sentenced Kuna to two years imprisonment on counts six through ten, the sentences to run concurrently. On count fifteen the court suspended imposition of sentence and placed Kuna on five years' probation with the condition that Kuna make restitution to the partners of $1.2 million, less any accounts paid to them. The court also ordered that Kuna not practice as a broker-dealer.

## II.

The defendant's primary argument is that at trial the district court constructively

---

1. The disparities between the monthly reports and the net liquidating balances as stipulated to and introduced at trial are listed below:

| Month Ending Date | Doherty Zable | First Options Statements | Difference |
|---|---|---|---|
| Feb. 29, 1980 | $1,247,260.00 | $1,230,029.17 | +$ 17,230.83 |
| Mar. 31, 1980 | $1,148,149.46 | $1,103,149.48 | +$ 44,999.98 |
| Apr. 30, 1980 | $1,396,766.13 | $1,396,766.13 | -0- |
| May 30, 1980 | $1,526,411.84 | $1,740,809.02 | −$ 214,397.18 |
| June 30, 1980 | $1,721,187.43 | $2,161,187.43 | −$ 440,000.00 |
| July 31, 1980 | $1,731,323.29 | $1,205,323.29 | +$ 526,000.00 |
| Aug. 20, 1980 | $1,771,309.54 | $ 999,309.54 | +$ 780,000.00 |
| Sept. 30, 1980 | $1,818,940.93 | $ 991,940.93 | +$ 827,000.00 |
| Oct. 31, 1980 | $1,903,331.08 | $ 134,794.17 | +$1,768,536.91 |

amended the indictment to charge the defendant with a scheme he had not been charged with in the indictment, thereby depriving the defendant of his fifth and sixth amendment rights to know the charge against him. The defendant relies on the fact that at trial the court stated "I think that if the government had their choice right now, they would reindict this crime and charge a *George*-type fraud, a deprivation of the fiduciary obligations owed to the limited partners .... But they didn't charge it." Tr. 563. The defendant also highlights the fact that when the court ruled on the case, the court stated: "I have narrowed the scheme charged by the government in a significant way." Tr. of Ruling 5.

The ten mail fraud counts of defendant's indictment charge that the defendant, in a scheme to "defraud and to obtain money and property by false and fraudulent pretenses and representations, and attempting so to do, did knowingly cause to be placed into the United States mail" envelopes to the various partners of Associates containing total equity reports for various months. Count one details the history of the scheme. The district court found that the government had proved a scheme beginning in August 1980, rather than in February 1980, and rejected the government's theory that Kuna had intended at the outset to defraud his investors.

The defendant argues that the district court's actions constitute a constructive amendment of the indictment. Defendant asserts that the indictment charged a scheme to obtain the investors' money by false pretenses but that the government proved a scheme to prevent the discovery of the false pretenses. The government argues that at most there existed a variance between the scheme alleged in the indictment, which was broad, and the scheme proven at trial, which was narrower. The government argues further that the variance was not fatal because it did not actually prejudice the defendant: Kuna was able to prepare a defense and was able to ensure that he will not again be prosecuted for the same offense because of the

variance in this case. The indictment charged Kuna with a scheme embracing the mailings of the false reports which was the scheme the district court found to have been proven. Count one of the indictment alleged that Kuna "would and did convert assets of Associates to his own use and benefit ... and would and did conceal the financial condition of Associates by submitting and causing the submission of false information to the partners of associates." Indictment, ¶ 4. The indictment also charged that Kuna "would and did cause financial reports to be sent to the partners of Associates from the office of Doherty Zable in Chicago. The false reports misrepresented the dollar value of Associates' assets at First Options." Indictment, ¶ 14. Finally, the indictment charged that as of "September, 1980, defendant ... did not disclose to the partners of Associates that monthly total equity reports which he had caused to be sent them did not accurately state the financial condition of Associates." ¶ 18.

■ It does not surprise us that in construing the same set of facts the defendant cries "amendment," while the government murmurs "variance." While there exists only a "rather shadowy distinction" between amendments and variances, C. WRIGHT, FED.PRAC. & PROX. CRIMINAL § 516 (1982), a finding of one rather than the other achieves a crystal clear difference in result: "[a]mendments have been held to be prejudicial *per se,* while variances may be subject to the harmless error rule." *United States v. Beeler,* 587 F.2d 340, 342 (6th Cir.1978). Despite the defendant's strenuous efforts to depict this as an amendment case, we think there was only a variance of the indictment at trial, and that this variance was harmless to the defendant.

■ In *United States v. Miller,* ―― U.S. ――, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), the Supreme Court neatly distinguished constructive amendments from variances: an amendment occurs when "the offense proved at trial was not fully

contained in the indictment, for trial evidence had ' "amended" ' the indictment by *broadening* the possible bases for conviction from that which appeared in the indictment." *Id.* at ——, 105 S.Ct. at 1816. A variance occurs where the trial evidence "narrowed the indictment's charges without adding any new offenses." *Id.* In *Miller*, the defendant had been charged with defrauding his insurer both by consenting to the burglary in advance and by lying to the insurer about the value of his loss. The trial proof, however, focused only on Miller's inflation of his claims. The government moved to strike the part of the indictment that alleged knowledge of the burglary, alleging that even without this allegation the defendant still had violated § 1341. The entire indictment was sent to the jury, which found Miller guilty.

■ The Supreme Court first noted that Miller could not have been surprised at trial by the absence of proof of alleged complicity in the burglary, and that the indictment was also sufficient to allow Miller to plead it in the future as a bar to subsequent prosecutions. *Id.* at ——, 105 S.Ct. at 1814. The Court also took special care to examine *Ex Parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), a case upon which Kuna heavily relies. The Court noted that *Bain* stands for two propositions: first, that "a conviction cannot stand if based on a offense that is different from that alleged in the grand jury's indictment," *id.* at ——, 105 S.Ct. at 1818, and, second, that "the striking out of parts of an indictment invalidates the whole of the indictment." *Id.* The first aspect of *Bain* has been approved in numerous cases, most principally in *United States v. Stirone*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), on which Kuna also relies. The Court concluded, however, that the first proposition did not support Miller because the offense for which Miller was convicted "was clearly and fully set out in the indictment." *Id.* at ——, 105 S.Ct. at 1819. The Court explicitly rejected *Bain*'s second proposition as inconsistent with "prior legal understanding." *Id.* A narrowing of the indictment, therefore, does not constitute an

amendment which renders the indictment void. *Id.*

In *Stirone* the Court found a constructive amendment of an indictment at trial. The indictment in *Stirone* charged the defendant with interference with the interstate importation of sand, while the evidence at trial showed the defendant interfered with the interstate exportation of steel. The Court held that this deprived the defendant of his "substantial right to be tied only on charges presented in an indictment returned by a grand jury," and that there was no way of knowing whether the grand jury would have been willing to charge the defendant with the exportation offense. *Id.* at p. 217, 80 S.Ct. at 273.

■ In a case preceding *Miller*, but essentially at one with its conclusion, this court construed *Stirone* and held that a constructive amendment is found where a "complex set of facts" is presented to the jury during the trial which is distinctly different from the set of facts set forth in the charging instrument. *United States v. Muelbl*, 739 F.2d 1175, 1180–81 (7th Cir. 1984). Alternatively, to find a constructive amendment the crime charged in the indictment must be "materially different or substantially altered at trial, [so that] it is impossible to know whether the grand jury would have indicted for the crime actually proved." *Id.* In *Muelbl* the defendant was charged with conspiracy to distribute or possess with intent to distribute marijuana, cocaine and methaqualone. The district court had instructed the jury to convict the defendant if they found that he was a member of a conspiracy to distribute any one of the three controlled substances. This court held that no constructive amendment occurred due to this instruction, reasoning that the grand jury must have found a conspiracy to distribute with respect to each of the drugs individually when they charged a conspiracy to distribute all the drugs collectively. The court reasoned that unlike *Stirone*, in which the evidence at trial proved a separate and unindicted act, no "complex set of facts"

had been proven at Muelbl's trial which differed from the conspiracy to distribute the drugs for which Muelbl had been indicted. This court concluded further that it was possible to know that the grand jury would have indicted on the proven conspiracy, since that conspiracy was a part of the larger indicted conspiracy.

There was no "complex set of facts" proven at Kuna's trial which differed from the facts charged in Kuna's indictment. While the indictment did charge that Kuna "intended to devise" a scheme to defraud Associates' investors, Indictment ¶ 3, and used the phrase "would and did" throughout the indictment to describe Kuna's scheme, the indictment charged more. The indictment also charged Kuna with concealing financial information to Associates's partners and causing false financial statements to be sent to them. The scheme proven therefore was simply a narrower version of the scheme alleged. *See United States v. Miller,* — U.S. —, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). We think this is sufficient to show that the scheme proven was included in the scheme charged and thus, under *Miller,* there was no amendment.

Moreover, to the extent that a variance existed, we think it was a harmless error in this case. A variance between allegation and proof is not fatal unless the defendant has been thereby deprived of an adequate opportunity to prepare a defense or has been exposed to a risk of being prosecuted twice for the same offense. *Muelbl,* 739 F.2d at 1181; *United States v. Kramer,* 711 F.2d 789, 795 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983). Neither of these infirmities is present in this case. Kuna was able to identify with great certainty the acts for which he was placed in jeopardy: the mailings of March through July for which he was acquitted, and the mailings of August through October for which he was convicted. Counts one through ten informed Kuna exactly what mailings were at issue, and paragraphs four, fourteen and eighteen of Count one charged that the

monthly reports were false and part of a scheme to mislead investors. Kuna was able to prepare a defense comprising the whole period of time and was in fact successful in defending against the allegations regarding the first part of it. Moreover, the district court in this bench trial did not think that a different set of facts or different scheme had been proved. The court stated that "basically I believe the government has proved I think all of the paragraphs [of the indictment] describing the scheme." Tr. of Ruling at 4. Therefore, Kuna was able to anticipate the government's entire case and prepare his defense. The district court's verdict will protect Kuna against another prosecution for a scheme relating to both the period of time charged, and that proven at trial. We hold, therefore, that any variance was harmless, and reversal is not required.

### III.

The defendant argues that the evidence was insufficient to support his convictions on either the mail fraud counts or the count involving the making of false statements to the SEC. We must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Moreover, the district court's findings of fact will not be set aside unless clearly erroneous. *Anderson v. City of Bessemer City,* — U.S. —, 104 S.Ct. 3532, 82 L.Ed.2d 837 (1985); *United States v. Tallman,* 437 F.2d 1103, 1104–05 (7th Cir.1971). We are unpersuaded by defendant's arguments on insufficiency and therefore treat them summarily.

The district court found that Kuna's trading was much riskier than that described in the offering memorandum, and that Kuna concealed his risky trading from Associates's partners by sending them false financial reports. The Judge further found that "if the defendant had disclosed the correct financial information, the private investors would have conducted an investigation, would have learned that he had converted funds to his own use, would have

learned that he was trading more riskily than at least they perceived and as I perceive was described in the offering circular." Tr. of Ruling 2–3. The district court's findings are supported by the evidence. Investors testified at trial that they had been lulled into a false sense of security by the monthly financial reports. The defendant presented no defense, but did stipulate to the exhibit displaying the disparity between the actual net liquidating balance and the monthly reports to the partners. The defendant's conviction therefore is supported by sufficient evidence.

■ The defendant also argues that insufficient evidence was introduced to prove that his application for registration as a broker-dealer with the SEC was false because he could have intended to register in his own name as a sole proprietor and engage in a business separate and independent of Associates's business. The defendant introduced no evidence at trial to support this theory. Furthermore, the defendant's argument on appeal acknowledges that in his application to the SEC he stated that he had obtained his CBOE membership with his own funds, that all capital required to conduct his business would be furnished by them and that he would operate his business as a sole proprietor with all income accruing to him. It is undisputed that on the date of his application to the SEC, Kuna had already traded in his own name on the First Options account. The account contained the funds of the investors in Associates and profits from the fund were to accrue to the partners. The evidence shows therefore that Kuna's statements in his application that the capital, membership and profits belonged to him alone were proven to be false and we see nothing erroneous in the district court's finding of falsity.

### IV.

■ The district court convicted Kuna on count fifteen, the false statement count, suspended his sentence and placed him on probation for five years. As a condition of probation, the district court ordered Kuna to make restitution to the limited partners in the amount of $1,200,000, less any amounts already paid to them. The statute under which the probation was imposed provides that a defendant on probation may be required to make restitution "to aggrieved parties for actual damages or losses caused by the offense for which conviction was had." 18 U.S.C. § 3651. Kuna's false statement submitted to the SEC knowingly misstated that he intended to purchase his CBOE membership with his own funds, to operate his business as a sole proprietorship, and to furnish his own capital. This offense does not involve aggrieved parties to whom restitution can be made, nor does it involve actual damages or losses which can be restored to the aggrieved parties, because the investors, the only aggrieved parties in this lawsuit, were not injured by the filing of this false statement. Nor did the district court find that the injury and loss proven at trial was attributable to the false statements. In fact, the court's findings indicate that it thought the injury and loss was attributable to Kuna's risky trading. We therefore vacate the condition of probation and remand the case to the district court. In so far as the district court imposes a sentence consistent with the sanctions it originally intended to impose, and consistent with this opinion, the Double Jeopardy clause is not affected. *See United States v. Covelli,* 738 F.2d 847, 862 (7th Cir.1984); *United States v. Jefferson,* 714 F.2d 689, 707 (7th Cir.1983).

### V.

In conclusion, we affirm the defendant's conviction for the reasons stated above and we vacate the condition of probation and remand for resentencing.

AFFIRMED IN PART, VACATED IN PART.