**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Breck M. SWANQUIST, Defendant–**
**Appellant.**

No. 97–2702.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 8, 1998.

Decided Nov. 27, 1998.

Vilija Bilaisis (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee.

Edward L. Foote (argued), Winston & Strawn, Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

A jury convicted Breck Swanquist of thirteen counts of making false statements to federally-insured financial institutions in violation of 18 U.S.C. § 1014. More specifically, the jury found that between 1988 and 1991, Swanquist repeatedly submitted incomplete personal financial statements and loan applications to various Illinois banks and concealed or under-reported certain debts to facilitate his receiving or renewing loans from these financial institutions. The district court sentenced Swanquist to concurrent 24–month terms of imprisonment and imposed a $6000 fine. Swanquist appeals, arguing that the evidence was insufficient to convict him and that the district court made numerous errors, including admitting in evidence the government's summary testimony and charts; restricting his expert witness's testimony; refusing to charge the jury on his "net worth" defensive theory or to give a separate elements-of-the-offense instruction

for each § 1014 count; incorrectly calculating for sentencing purposes the amount of loss caused by his fraudulent actions; and incorrectly adjusting his sentence upwards by two points for obstruction of justice. We affirm.

## I. BACKGROUND

On February 29, 1988, Swanquist, the President and Chief Executive Officer of Gary Wheaton Bank of Fox Valley, Illinois (a subsidiary bank of First Chicago Corporation), filled out an application for a home mortgage loan. On the portion of the application entitled "Liabilities and Pledged Assets," Swanquist disclosed that he had four outstanding bank loans totaling $383,450. He did not disclose, however, eleven other loans from six financial institutions equaling almost $400,000. In April of 1988, Swanquist submitted the application to Midwest Mortgage Services, an underwriter evaluating his request for a residential loan from NBD Bank of Evanston.

In October of 1988, Swanquist tendered a self-created personal financial statement, dated October 1, 1988, to Citizens National Bank to borrow money for a new Porsche. Swanquist submitted the same financial statement to Boulevard Bank on April 3, 1989 to assure continued approval of three outstanding loans totaling $47,000. At the time he submitted the statement to Citizens National Bank, Swanquist had unsecured bank loans totaling approximately $188,000, although his statement represented the amount to be only $19,000. When Swanquist resubmitted the same financial statement to Boulevard Bank six months later, his outstanding bank loans totaled approximately $189,000.

In June of 1989, Swanquist tendered another self-created personal financial statement, dated June 1, 1989, to two banks: First National Bank of Des Plaines, which then renewed an outstanding $40,000 loan; and Merchants National Bank of Aurora, where Swanquist successfully obtained two new loans totaling $58,000, a $75,000 line of credit, and renewal of an outstanding $87,359 loan. The financial statement represented that Swanquist had real estate mortgages equaling $398,000, auto loans equaling $45,000, and unsecured debt equaling $16,000. At the time he submitted the statement to

the two banks, however, Swanquist actually had real estate mortgages equaling approximately $477,000, auto loans equaling approximately $57,000, and unsecured debt equaling approximately $185,000—amounting to a total discrepancy of approximately $260,000. Swanquist submitted the same financial statement to Boulevard Bank on January 30, 1990, when he again sought continuing approval of the three outstanding loans that now totaled $46,000. As of this date, Swanquist had amassed real estate mortgages totaling approximately $551,000, auto loans totaling approximately $102,000, and unsecured bank debt totaling approximately $248,000. Thus, by the time Swanquist submitted the June 1, 1989 financial statement to Boulevard Bank, his outstanding debt in these three categories surpassed the amounts disclosed on the financial statement by approximately $442,000.

On April 20, 1990, Swanquist tendered a self-created personal financial statement, dated March 1, 1990, to Mid America Federal Savings Bank when he applied for two short-term unsecured loans, each in the amount of $35,000, to purchase polo ponies. On this statement, Swanquist claimed that he had outstanding notes payable in the amount of $105,000. In truth, on the date he submitted the financial statement, he had notes payable totaling approximately $269,000. In August of 1990, Swanquist submitted the same financial statement to Aurora National Bank to obtain two short-term unsecured loans totaling $18,000. As of this date, Swanquist had outstanding notes payable totaling approximately $337,000.

In September of 1990, Swanquist tendered a self-created personal financial statement, dated August 31, 1990, to Merchants National Bank. On this statement, Swanquist disclosed outstanding loans in the amount of $902,000 when in fact his actual loans totaled approximately $1,006,000.

In November of 1990, Swanquist applied for a home mortgage loan with First Midwest Bank, and on this occasion he submitted a self-created personal financial statement signed on November 15, 1990 (but dated December 10, 1990), in which he disclosed that he had truck and trailer loans in the

amount of $35,000, and notes payable in the amount of $189,000. As of December 10, 1990, however, Swanquist actually had approximately $47,000 in truck and trailer loans, and approximately $502,000 in outstanding notes payable. Swanquist also submitted the same financial statement to First National Bank of Des Plaines in December of 1990.

In April of 1991, Swanquist submitted a mortgage application, dated March 23, 1991, to Midwest Mortgage Services while seeking approval for a home mortgage loan from Gary Wheaton Bank of Batavia. On the application, Swanquist stated that he had a real estate mortgage in the amount of $300,-000, and three other loans totaling $87,700. As of April 1, 1991, however, Swanquist had outstanding loans in the approximate amount of $833,000, including nine bank loans and a family loan not disclosed on the financial statement.

Throughout 1991, Swanquist also tendered another self-created personal financial statement, this one dated January 31, 1991, to four different banks: (1) to Boulevard Bank on April 1 when he again sought continuing approval of three loans; (2) to Citizens National Bank sometime between February 10 and April 6 to renew an outstanding $10,000 loan; (3) to DuPage Valley State Bank in early June to borrow $14,000; and (4) to Firstar Park Forest Bank in August to borrow $18,000. The financial statement listed outstanding truck and trailer loans in the amount of $35,000, notes payable in the amount of $162,000, and one additional loan in the amount of $4,000. However, on the day Swanquist filled out the financial statement, he actually had approximately $47,000 in truck and trailer loans and approximately $542,000 in notes payable.

Meanwhile, beginning in the fall of 1990, the audit department of First Chicago Corporation began investigating Swanquist's debt load. Members of the audit department, including Timothy Boland and Tom Begg, procured copies of Swanquist's credit reports, set up a meeting with Swanquist to review his credit reports and loans, and then decided after the meeting to monitor Swanquist's financial load.

In November of 1991, the audit department again investigated Swanquist's financial circumstances and obtained current versions of Swanquist's credit reports, as well as his October 1991 Regulation O disclosure form, a federal form on which executive officers of financial institutions must disclose debts incurred at other financial institutions. The auditors compared the Regulation O form to Swanquist's Midwest Mortgage Services loan file, which contained the self-created personal financial statement that Swanquist had tendered with his March 1991 mortgage loan application. The comparison reflected a number of loans listed on the Regulation O form which were not listed on the mortgage application. The discovery of this discrepancy led to another meeting with Swanquist. At this meeting, Boland and Begg asked Swanquist why certain portions of the Midwest Mortgage Services loan application form, such as the "total liabilities" and "net worth" columns, were left blank. Swanquist responded that the omissions were an "oversight." When Boland and Begg pointed out five bank loans disclosed on the Regulation O form that were not listed on the mortgage application, Swanquist again responded that these omissions were "oversights." Boland and Begg then asked Swanquist whether he had additional undisclosed debt, and Swanquist admitted that he also carried approximately $230,000 in family debt. The next day, James Carey, the head of First Chicago Corporation's internal audit department, met with Swanquist and asked for an explanation regarding the discrepancies. Swanquist responded to Carey's inquiry simply by stating that the mortgage application was "incomplete." Swanquist was asked to tender his resignation from Gary Wheaton Bank shortly thereafter.

In late 1991, First Chicago reported its discovery to the Federal Bureau of Investigation, who assigned the case to Gary Sebo, an FBI special agent. On March 27, 1996, a federal grand jury returned a seventeen-count indictment charging Swanquist with making false statements to federally-insured financial institutions to influence the approval, issuance, or renewal of loans in violation of § 1014. On September 3, 1996, the grand jury returned a sixteen-count superseding

indictment, each count of which corresponded, in chronological order, to a specific instance in which Swanquist submitted financial statements to a financial institution to influence the approval, issuance, or renewal of loans. Swanquist pleaded not guilty, and a jury trial commenced on October 2, 1996.

At trial, the government presented evidence demonstrating that between 1988 and 1991, Swanquist on a number of occasions submitted incomplete personal financial statements to banks, thereby concealing and under-reporting certain debts in order that he might receive or renew loans from numerous financial institutions. Bank officials from many of the involved banks, such as Gary Bogenberger, a vice president with First National Bank of Des Plaines, and Peter Dickes, a vice president with Merchants National Bank, testified that they expected applicants to inform them of all outstanding debts and that they knew of no practice permitting loan applicants to omit categories of debt. Bank officials also testified as to the nature of Swanquist's loans; for instance, whether a specific loan was secured or unsecured.

During its case in chief, the government called FBI Agent Sebo to summarize the government's evidence. Sixteen charts, one for each count of the superseding indictment, were presented to the jury through Agent Sebo. On the left-hand side of each chart, Agent Sebo listed the loans Swanquist actually disclosed on the relevant financial statement or loan application. On the right-hand side, Agent Sebo listed Swanquist's actual outstanding loans. From these charts, the jury could see the discrepancies between the information Swanquist supplied to the various banks and the actual state of his financial affairs at the time of disclosure.

Swanquist, testifying on his own behalf, stated that his financial statements and loan applications were not false because all of the allegedly undisclosed information was either disclosed elsewhere in the documents or was not required to be disclosed because only unsecured debts were to be listed and the unlisted loans were not unsecured. For instance, he testified that the October 1, 1988 financial statement submitted to Citizens National Bank and Boulevard Bank need not have disclosed an allegedly unsecured loan with Champion Bank because this loan actually was secured by an "assignment of beneficial interest" in his land trust. Nor, he said, was he required to list outstanding loans from National Bank of Des Plaines and Merchants National Bank because these loans were secured by stock, the value of which was included in the portion of the relevant statement entitled "marketable securities (net)." Similarly, Swanquist testified that two undisclosed loans with Boulevard Bank were secured by language in the loan documents granting the bank a lien on all of the Borrower's property "in the possession of or under the control of the bank." He also claimed that certain loans with First National Bank of Des Plaines and Merchants National Bank did not have to be disclosed on his June 1, 1989 financial statement because they were secured by negotiations with bank officials giving the banks a security interest in his house. As for an undisclosed $235,000 loan from his family, Swanquist testified that this loan was "between family" and was not required to be listed on the Regulation O form.

Numerous government exhibits undermined Swanquist's testimony. As an example, although Swanquist testified that he did not disclose his $65,000 loan with the First National Bank of Des Plaines (reduced to $40,000 in 1989) on any of his applications or financial statements because it was secured, the First National loan documents indicate that the loan actually was unsecured. Similarly, although Swanquist claimed at trial that all of his loans with Boulevard Bank were secured by property within the bank's possession or control, the bank only possessed the title to one of Swanquist's cars, having an approximate worth of $15,000.

A jury found Swanquist guilty on thirteen of the sixteen counts, and the district court sentenced him to concurrent 24-month prison sentences on each count.

## II. ISSUES

Swanquist advances seven arguments for consideration. Initially he contends that the evidence is insufficient to sustain his convictions; second, that the district court abused its discretion in admitting into evidence the government's summary testimony and charts

and in restricting his cross-examination of the summary witness; third, that the court abused its discretion in limiting the testimony of his expert witness; fourth, that the court erroneously refused to charge the jury on his "net worth" defensive theory; fifth, that the court improperly refused to give a separate elements-of-the-offense instruction for each count of the superseding indictment; sixth, that the court incorrectly calculated for sentencing purposes the amount of loss caused by his fraudulent actions; and seventh, that the court erred in increasing his base offense level by two points for obstruction of justice.

### III. DISCUSSION

#### A. The Sufficiency of the Evidence

■ Initially Swanquist contends that the evidence is insufficient to sustain his § 1014 convictions.[1] His argument is twofold. First, although he discusses no particular count of the superseding indictment, or any of the evidence, Swanquist attacks generally his convictions, arguing that the government failed to disprove his testimony that, at the time he submitted the financial statements and applications, he believed his answers to be truthful based upon his own understanding about which categories of debts were required to be disclosed in the documents and which debts fell within each of these categories. Swanquist also broadly asserts that the government failed to establish the meanings or parameters of various categories of debt, e.g., "unsecured debt," "notes payable," and "real estate mortgages," or that his use and understanding of these categories on the various documents was contrary either to his trial testimony or to widely accepted interpretations of these terms within the banking industry.

■ We review the record and the evidence in the light most favorable to the government. *United States v. Draves*, 103 F.3d 1328, 1332 (7th Cir.1997), *cert. denied*, — U.S. —, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997). Pursuant to this deferential standard, "we will reverse only if there is no evidence from which any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *United States v. Penson*, 896 F.2d 1087, 1093 (7th Cir.1990)). In conducting this inquiry, we are obliged to defer to the jury's reasonable inferences and to the weight it gave the evidence. *United States v. Magana*, 118 F.3d 1173, 1186 (7th Cir. 1997), *cert. denied*, — U.S. —, 118 S.Ct. 1104, 140 L.Ed.2d 158 (1998); *United States v. Caudill*, 915 F.2d 294, 297 (7th Cir.1990).

In this case, a number of witnesses testified regarding the nature of Swanquist's outstanding undisclosed loans. Lewis Ruff, an assistant vice president at Boulevard Bank during the relevant time period, testified that Swanquist had three unsecured loans with the bank. Gary Bogenberger and Ronald T. Larson, a consumer loan officer with First National Bank of Des Plaines, both testified that Swanquist's $65,000 loan with the bank was unsecured. Peter Dickes testified that Swanquist had a number of unsecured loans with Merchants National Bank, including an $18,000 loan and a $40,000 loan. Dickes also testified regarding a $144,000 unsecured loan that the bank renewed in July of 1990 following Swanquist's agreement to provide the bank with a secondary mortgage on his home. Dickes explained that the bank sought collateral on the loan prior to renewal because it was worried that it was "not getting paid off on a large $144,000 unsecured loan, and the repayment programs were not falling in place, so we wanted some collateral to secure ourselves." Moreover, as mentioned previously, many bank officials testified that they expected applicants to inform them of all outstanding debts and that they knew of no practice permitting loan applicants to omit categories of debt. Based upon the totality of the evidence presented, the jury could rationally have concluded that Swanquist's trial testimony was untruthful or false: that he knew the undisclosed loans were unsecured; that he should have disclosed all of his loans—both secured and unsecured—on the financial applications;

---

1. An individual violates 18 U.S.C. § 1014 when he "knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application[,] ... commitment, or loan...." 18 U.S.C. § 1014.

and that he provided banks with false information for purposes of influencing the loan approval, renewal, or issuance procedure. The mere fact that the government did not see fit to educate the jury regarding the exact definitions of the various categories of debt does not undermine our confidence in the ability of the jury, based on the evidence before it, to understand the trial testimony and to find the essential elements of the crime beyond a reasonable doubt.

Swanquist's remaining contention concerning the sufficiency of the evidence is more focused. He maintains as to counts three, six, and thirteen of the superseding indictment, all of which involve Boulevard Bank, that the government never proved he submitted false statements to influence Boulevard Bank in approving, issuing, or renewing loans. According to Swanquist, the evidence merely established that the bank asked for financial statements simply to keep its loan files current, not to undertake any loan activity. Conviction on this proof, Swanquist maintains, effectuated a constructive amendment of the indictment.

After reviewing the record, we find no evidence of a constructive amendment. As this court stated in *United States v. Kuna*, 760 F.2d 813 (7th Cir.1985):

"[A] constructive amendment is found where a 'complex set of facts' is presented to the jury during the trial which is distinctly different from the set of facts set forth in the charging instrument. Alternatively, to find a constructive amendment the crime charged in the indictment must be 'materially different or substantially altered at trial, [so that] it is impossible to know whether the grand jury would have indicted for the crime actually proved.'"

*Id.* at 818 (*quoting United States v. Muelbl*, 739 F.2d 1175, 1180–81 (7th Cir.1984)); *see also United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir.1998). In this case, neither form of amendment occurred. The jury heard neither a "complex set of facts" that differed greatly from the allegations in the superseding indictment nor evidence that proved a violation of a materially different law. To the contrary, we are convinced that the jury heard ample evidence directly supporting the allegations of the superseding indictment. Boulevard Bank officer Lewis

Ruff's internal notes and correspondence indicate that in 1988 and 1989, pursuant to bank policy, Ruff repeatedly asked Swanquist for updated financial information. Ruff then used this information to calculate the risk associated with Swanquist's loans and the sagacity of renewing his existing loans or even extending further credit. For instance, upon receipt of Swanquist's June 1, 1989 financial statement, the bank decided to downgrade Swanquist's creditworthiness "because of the long carry of this unsecured credit." This evidence convinces us that the jury considered testimony and documents indicating that Boulevard Bank sought Swanquist's financial information for purposes directly related to loan activity and that the scheme proven at trial was included within the scheme charged. *See Kuna*, 760 F.2d at 819.

### B. The Admission of Agent Sebo's Testimony and Summary Charts

Next, Swanquist raises three arguments in connection with Agent Sebo's testimony. He contends that the district court abused its discretion in admitting into evidence the government's summary charts, as presented by Agent Sebo, because they contained "contested" evidence. For example, Swanquist argues that Charts 2 and 3 improperly label as "unsecured" two $8000 loans with Champion Federal Bank [one that was paid off by October of 1988 and one that was acquired in October of 1988] because no one from Champion specifically testified that these loans were unsecured and because, says Swanquist, the charts do not take into account an assignment of beneficial interest that Swanquist claims was used "to secure existing and future obligations owed to Champion."

We find no merit to this argument. Rule 1006 of the Federal Rules of Evidence permits a party to introduce in the form of a chart, summary, or calculation "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court." Fed.R.Evid. 1006; *see also United States v. Petty*, 132 F.3d 373, 379 (7th Cir.1997). A party is not obligated,

however, to include within its charts or summaries its opponent's version of the facts. *United States v. Radseck*, 718 F.2d 233, 239 (7th Cir.1983). Swanquist had ample opportunity during his cross-examination of Agent Sebo to elicit any facts that might have suggested that the government's charts incorrectly captured the nature of his Champion Bank loans. Moreover, the court instructed the jury that the summary charts were not evidence, that they were admitted simply to aid the jurors in evaluating other evidence, and that it was for the jurors to decide whether the evidence supported the summaries. *See id.* (affirming admission of summary charts where "[t]he jury was admonished by the court that the exhibits purported to be only 'the Government's submission of the Government's theory'" of the case). Finally, with regard to the lack of direct testimony that the $8000 loans were unsecured, we note that the government introduced in evidence (as Exhibits CFB 4A and 4B) a copy of Swanquist's October 1988 loan application that clearly indicates on its face that the loan was unsecured. The admission of this document into evidence renders irrelevant any lack of direct testimony. As for the other $8000 loan, Swanquist fails to direct us to any documentation establishing that this loan was secured, and our own review of the documentation pertaining to this loan likewise fails to reflect that this loan was secured.

 Second, Swanquist maintains that the court erred in admitting Agent Sebo's testimony regarding the charts. We disagree. Trial courts have broad discretion to admit or exclude evidence, and we review rulings dealing with the admission of evidence only for an abuse of discretion. *See United States v. Zizzo*, 120 F.3d 1338, 1351 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 566, 139 L.Ed.2d 406 (1997). Contrary to Swanquist's assertions, Agent Sebo did not testify as an expert witness—that is, by offering opinions and drawing inferences based on some special skill, knowledge, or experience that the jurors themselves did not possess. *See United States v. Benson*, 941 F.2d 598, 604 (7th Cir.1991) (remanding case after the government's summary witness invaded the province of the jury by making credibility determinations and drawing infer-

ences from the evidence that the jury was equally qualified to make). Rather, he acted within the appropriate parameters of a summary witness by testifying simply as to what the government's evidence showed. *See Radseck*, 718 F.2d at 239 ("'The nature of a summary witness's testimony requires that he draw conclusions based upon the evidence presented at trial.'") (quoting *United States v. Esser*, 520 F.2d 213, 218 (7th Cir.1975)). At Swanquist's request, the court restricted Agent Sebo from offering his own opinion or inferences and instructed the jurors that it was for them to decide "whether the evidence supports all or any of the summary evidence to which Mr. Sebo testified." Thus, we find no abuse of discretion.

 Third, Swanquist contends that the district court improperly limited his cross-examination of Agent Sebo, thereby depriving him of his Sixth Amendment right of confrontation. Ordinarily, we review a trial court's curtailment of cross-examination for an abuse of discretion. Only where the limitation directly affected the defendant's Sixth Amendment right to confrontation do we conduct a *de novo* review. *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir.1998); *United States v. Sasson*, 62 F.3d 874, 882 (7th Cir.1995) (distinguishing between peripheral concerns and "core values of the confrontation right"). Our review of the trial testimony reveals no Sixth Amendment violation—only Swanquist's frustration with his inability to extract helpful testimony from an adverse witness. "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). If the defense is given an opportunity to expose "a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination." *Cueto*, 151 F.3d at 638. Here, Swanquist had the opportunity to cross-examine Agent Sebo within the scope of his direct testimony. Simply because Swanquist was unable to elicit favorable answers regarding his version of the facts or to "hammer [these] point[s] home to the jury," does not mean he suffered

a constitutional deprivation. *Sasson*, 62 F.3d at 882.

### C. Limitations on Swanquist's Expert's Testimony

■ Swanquist's expert witness, Martin Levy, testified regarding his understanding of the term "net worth" and the relevance of this concept to Swanquist's financial statements. The court, however, prohibited Levy from testifying regarding "off balance sheet financing," the accuracy of Agent Sebo's charts, or the ambiguous nature of Swanquist's financial statements on grounds that Levy was an accountant, not a banker, such that his proposed testimony likely would confuse the jury. Swanquist now insists that the trial court "effectively gutted" the core theory of his defense by prohibiting Levy from testifying in these areas. We review the district court's ruling for an abuse of discretion. *United States v. Webster*, 125 F.3d 1024, 1032 (7th Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 698, 139 L.Ed.2d 642 (1998); *United States v. Willis*, 61 F.3d 526, 532–33 (7th Cir.1995).

The district court prevented Levy from testifying about "off balance sheet financing," a financing arrangement popular in the late 1980's and early 1990's that "permitted" companies and individuals to omit certain assets and liabilities from their balance sheets, on grounds that such testimony was irrelevant and would be confusing to the jury. According to Swanquist, this testimony would have helped explain to the jury that seemingly undisclosed loans actually were accounted for within his net asset calculations. The court's ruling was not an abuse of discretion. *See United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir.1996) (irrelevant testimony is not admissible, and the district court retains the discretion to make this determination). We agree with the court that Levy, as an accountant with no banking experience, was not qualified to tell the jury that this form of financing was acceptable within the banking community.

Moreover, the financial applications at issue in this case specifically requested information pertaining to Swanquist's assets and liabilities; thus, testimony regarding a form of financing permitting the omission of this very information clearly was intended to throw smoke in the jurors' eyes.

■ Nor are we of the opinion that the trial court committed error with respect to its other evidentiary rulings. Regarding the financial statements, which Levy wanted to explain were ambiguous and required additional clarification, the court found that Levy was not qualified to testify regarding a banker's additional need for clarification. Special deference is due the court's assessment of the probative value of this evidence as it was in the best position to weigh probative value against "the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403; *see also United States v. Fawley*, 137 F.3d 458, 466 (7th Cir.1998) ("a district court's Rule 403 balancing is afforded a special degree of deference: '[o]nly in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge.'") (citations omitted). As for prohibiting Levy from attacking the contents of Agent Sebo's charts by pointing out Sebo's lack of consideration for Swanquist's explanations regarding the financial deficiencies, we note that the government was not required to include in its charts the defense's version of the facts. Accordingly, the court acted well within its discretion in excluding this line of Levy's testimony.[2]

### D. Swanquist's "Net Worth" Defensive Theory

■ Next, Swanquist challenges the district court's refusal to charge the jury with his "net worth" defense theory. He contends that the court refused to give his proposed defensive theory instruction, which stated that it was his

---

2. During his closing argument, defense counsel attempted to undermine Agent Sebo's credibility by pointing out his failure to rebut key points of Levy's testimony. Following an objection by the government, the court stated that the defense's statement to the jury was inappropriate in light of the restrictions it had placed on Agent Sebo's

testimony at Swanquist's urging. We find no merit to Swanquist's contention that the court's comment was erroneous. Indeed, we agree that since Agent Sebo was not allowed to rebut Levy's testimony, defense counsel's statement during closing was improper.

theory of the defense that the financial statements and mortgage applications which he provided to the banks and financial institutions involved here were not false and represented his understanding of his financial position at the time the statements were prepared, *including his knowledge of his debts and net worth* (emphasis added).

Although the trial court included in its final charge all but the emphasized language, Swanquist argues that the edit prevented the jurors from considering his defensive theory that people who understate their liabilities on "one or two lines" of a financial statement do so without criminal intent if, at the time, they have a substantial net worth. In other words, since bankers rely on an applicant's "total financial statement," a conviction for falsifying answers about specific categories of liabilities should only be sought where the applicant/defendant materially understated his net worth.

 It is well settled in this circuit that a defendant is entitled to a jury instruction as to his or her particular theory of defense provided: "(1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the appellant a fair trial." *United States v. Edwards*, 36 F.3d 639, 645 (7th Cir.1994) (citations omitted); *see also United States v. Linwood*, 142 F.3d 418, 422 (7th Cir.) (quoting *Edwards*), *cert. denied*, ── U.S. ──, 119 S.Ct. 224, 142 L.Ed.2d 184 (1998). We review the district court's ruling for an abuse of discretion. *Mary M. v. North Lawrence Community School Corp.*, 131 F.3d 1220, 1225 (7th Cir. 1997), *cert. denied*, ── U.S. ──, 118 S.Ct. 2369, 141 L.Ed.2d 737 (1998). Reversal is warranted only if Swanquist can satisfy all four criteria listed above. *United States v. Akinsanya*, 53 F.3d 852, 857 (7th Cir.1995).

 Swanquist's argument fails because his proposed jury instruction fails to state the law accurately. Swanquist's posi-

tion is that the false statements in the financial statements and applications submitted to the various banks do not give rise to criminal liability because his allegedly high net worth was of sufficient magnitude to render insignificant any "understatements." In other words, he says, the false statements were not material.[3] However, as the Supreme Court made clear in a case pending at the time of Swanquist's trial, the proper interpretation of § 1014 is one that excludes any element of materiality. *United States v. Wells*, 519 U.S. 482, 490–91, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). Thus, although the district court before the announcement of *Wells* understandably followed this court's erroneous construction of § 1014 when it instructed the jury as to materiality, materiality is not, and never was, an element of the crime of knowingly making a false statement to a federally-insured bank under § 1014. *See United States v. Pribble*, 127 F.3d 583, 588 (7th Cir.1997), *cert. denied*, ── U.S. ──, 118 S.Ct. 1056, 140 L.Ed.2d 118 (1998) (acknowledging, in a case tried before *Wells* but argued on appeal after *Wells*, that materiality is not an element of § 1014 and thus holding that the district court had not erred in refusing to apply pre-*Wells* precedent). Accordingly, Swanquist's proposed jury instruction properly was withheld from the jury's consideration.

### E. The Elements–of–the–Offense Jury Instruction

 Swanquist also takes issue with the district court's instruction on the essential elements of § 1014. Swanquist proposed at trial that the court give a separate elements-of-the-offense instruction for each of the counts of the superseding indictment, all of which alleged a violation of § 1014. Instead, the court charged the jury in Instruction 18 as follows:

> The defendant Breck Swanquist is charged in Counts One [through] Sixteen of the indictment with violations of Title 18, United States Code, § 1014. That statute states in pertinent part:

> *Wells*, 519 U.S. 482, 489, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (citations and internal quotations omitted).

---

**3.** "Materiality" is defined as "ha[ving] a natural tendency to influence, or [being] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v.*

Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... any institution the accounts of which are [federally] insured ... upon any application or loan ....

shall be guilty of an offense against the United States.

In its next instruction, Instruction 19, the court, in relevant part, charged the jury as follows:

To sustain the charges in Counts One [through] Sixteen of the indictment, the government must prove the following propositions as to each count:

First: that the defendant made or caused to be made a false statement to a bank or financial institution;

Second: that the defendant knew that the statement was false at the time it was made;

Third: that the defendant made the statement with the intent to influence the action of the bank or financial institution in issuing, approving, or renewing a loan or line of credit....

Focusing exclusively on Instruction 18, Swanquist argues that the charge as given permitted the jury to convict if it found that he made "any false statement" for the purpose of influencing "in any way" the actions of the recipient financial institution, as opposed to permitting conviction only upon proof that the statements charged in the indictment were false and made for purposes of influencing the recipient financial institutions in issuing, approving, or renewing loans. In other words, says Swanquist, the jury instruction constructively amended the superseding indictment and deprived him of his right to be tried only on the charges returned by the grand jury.

■ "In determining the correctness of jury instructions, a reviewing court 'must determine from looking at the charge as a whole, whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues.'" *Fawley*, 137 F.3d at 467 (quoting *United States v. Abdelkoui*, 19 F.3d 1178, 1182 (7th Cir.1994)). Applying this standard, we are convinced that the jury instructions sufficiently apprised the jury of the applica-

ble law and that no constructive amendment occurred. Although the "in any way" language recited in Instruction 18 reads more broadly than the language of the superseding indictment, any possibility of a constructive amendment concerning the kind of activities being prosecuted was cured by the language of Instruction 19, which informed the jury that in order to sustain a conviction on any count, it had to find that Swanquist made a false statement to a financial institution; that he knew the statement was false at the time it was made; and that he made the statement with the intent to influence the action of the financial institution in *issuing, approving,* or *renewing* loans. As for the "any false statement" language of Instruction 18, we fail to see how the court's instructions could have permitted conviction for an offense beyond the parameters of the superseding indictment. We also note that the jury acquitted Swanquist on three of the sixteen counts, thereby indicating that it paid close attention to the specific allegations of the superseding indictment and was not misled by jury instructions that failed to mirror the indictment's exact language.

■ Counts one and twelve present a slightly different picture. As to these two counts, the superseding indictment simply alleges that Swanquist knowingly made false statements to NBD Bank of Evanston and Gary Wheaton Bank of Batavia for purposes of influencing the issuance of loans. Accordingly, at first blush, it would appear that Instruction 19, by also permitting conviction if the jury found that Swanquist had made the false statements to influence the approval or renewal of loans, constructively amended the indictment. However, a closer look at these counts convinces us otherwise. As discussed above, "[a] constructive amendment occurs where the offense proven at trial was not included within the parameters of the indictment." *Remsza*, 77 F.3d at 1043 (citing *United States v. Mosley*, 786 F.2d 1330, 1335 (7th Cir.1986)). That is not the case here. The indictment charged Swanquist with submitting false financial statements to NBD of Evanston and Gary Wheaton Bank to influence the issuance of loans, and the government introduced evidence at trial indicating that Swanquist did in fact misled those finan-

cial institutions for that very purpose. The defendant has failed to direct us to anything in the record that would serve to establish that the evidence presented at trial differed from the allegations of the superseding indictment or proved a violation of a materially different law. Accordingly, we find no error with the district court's refusal to give a separate elements instruction for each count in lieu of Instructions 18 and 19.

### F. The Amount of "Loss" Calculation

 Swanquist next contends that the court erroneously increased his base offense level by seven points pursuant to U.S.S.G. § 2F1.1 after determining that the amount of "loss" resulting from his conduct equaled $171,033. The district court arrived at this amount by calculating the amount of money Swanquist owed the various institutions on the date the government discovered his fraudulent conduct. Swanquist maintains that the district court should not have calculated loss from the date of the government's discovery but instead should have focused on the date the individual financial institutions discovered his fraud. Following Swanquist's suggestion, the amount of loss would be zero because, although his employer and the FBI knew about his fraud before repayment, all of his outstanding loans had been repaid before the lending institutions learned of his actions. We review for clear error the district court's loss valuation. *United States v. Kelley*, 76 F.3d 436, 439 (1st Cir.1996).

 Application Note 7(b) to § 2F1.1 provides that in fraudulent loan application cases involving a defendant who obtains a loan by misrepresenting the value of his assets, the amount of loss "is the amount of the loan not repaid at the time the offense is discovered." Although this circuit has yet to decide when an offense is "discovered" within the context of § 2F1.1, the Sixth Circuit has ruled on this very issue and has concluded that "the concept of when an 'offense is discovered' relates to discovery by the victim or the proper authorities, whichever comes first." *United States v. Lucas*, 99 F.3d 1290, 1296 (6th Cir.1996). The *Lucas* court also held that after "discovery" has occurred, money subsequently repaid on fraudulently procured loans may not be set off against the amount of loss calculated under Application Note 7(b). *Id.* at 1296–97. We agree with the analysis of the Sixth Circuit and join in its holding. Applying these definitions to the facts of this case, we conclude that the district court did not err in calculating the amount of loss caused by Swanquist's conduct from the date of the government's discovery and in adjusting his sentence accordingly.

### G. Obstruction of Justice Enhancement

 Finally, Swanquist maintains that the district court abused its discretion in finding that he perjured himself at trial and in increasing his base offense level by two points for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Swanquist contends that the court improperly found that he was less than truthful in his testimony when he explained his state of mind at the time he completed the applications and financial statements and when he gave his purported interpretation of the categories of debt and words used on those documents. We review the court's determination regarding a defendant's obstruction of justice under the clearly erroneous standard. *United States v. Sinclair*, 74 F.3d 753, 762 (7th Cir.1996). Factual findings with respect to sentencing will be overturned only if this court is left with " 'a definite and firm conviction that a mistake has been committed.... Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *United States v. Hickok*, 77 F.3d 992, 1007 (7th Cir.1996) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

 Section 3C1.1 states that a sentencing court shall increase a defendant's base offense level by two points if he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Perjury is one possible basis for applying this adjustment. U.S.S.G. sec. 3C1.1, comment. (n 3(b)). A defendant commits perjury when he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confu-

sion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993); *United States v. Agostino*, 132 F.3d 1183, 1198 (7th Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998) (quoting *Dunnigan*). In this case, after listening to arguments at sentencing and reviewing all the evidence, the court found that Swanquist was well aware of the fact that the various loans were unsecured and that his contradictory testimony was false. For instance, although Swanquist testified that he did not disclose his $63,000 loan with First National Bank of Des Plaines because it was secured by negotiations for a home equity loan, the court saw and heard evidence establishing that the loan was unsecured until September of 1991. Similarly, although Swanquist testified that his loans with Merchants National Bank were secured, the court heard testimony to the contrary from Peter Dickes, who stated that, as of October 1988, Swanquist's loans were unsecured. The district court's findings constitute a permissible view of the evidence and thus cannot be clearly erroneous.

Swanquist's conviction and sentence are AFFIRMED.