**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jesse H. SWINSON, Defendant–Appellant.**

**No. 92–2839.**

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1993.

Decided May 20, 1993.

Stephen A. Ingraham, Asst. U.S. Atty. (argued), Milwaukee, WI, for plaintiff-appellee.

Dennis P. Coffey (argued), Coffey, Coffey & Geraghty, Milwaukee, WI, for defendant-appellant.

Before RIPPLE and MANION, Circuit Judges, and ENGEL, Senior Circuit Judge.*

---

* Hon. Albert J. Engel, Senior Circuit Judge for the Sixth Circuit, is sitting by designation.

MANION, Circuit Judge.

A jury convicted Jesse H. Swinson of mail fraud, 18 U.S.C. § 1341, concerning a scheme whereby Swinson had defrauded his employer of nearly $300,000. Because the prosecution failed to produce sufficient evidence of a mailing, we reverse the conviction.

## I. Background

In early 1986 the Kohler Company hired Jesse Swinson as an electrical engineer. Soon thereafter Kohler promoted him to manage a multi-million dollar mill building project. The mill was to improve the quality and reduce the cost of placing enamel finish on Kohler's cast iron plumbing fixtures. As project manager, Swinson signed a pledge not to violate Kohler's conflict of interest policy, which forbids salaried workers from having a financial interest in any company that does business with Kohler and requires full disclosure should a conflict of interest arise.

Rather than avoid a conflict of interest, Swinson created one. Swinson incorporated a dummy business, Dynamic Control Engineering (DCE). To take advantage of his employment position and extract more money from Kohler, on February 24, 1987, Swinson rented a mailbox for DCE, identified as Mail Plus, 11112 North Port Washington Road, Mequon, Wisconsin. He also rented a twenty-four hour a day unlisted telephone answering service for DCE in Milwaukee, and he opened a checking account in the name of DCE in Fredonia.

The scheme lasted from December 1987 to September 1989. During that time DCE billed Kohler $269,037.78 for phantom goods and services. Either the work was never performed, or had already been performed and billed by other, legitimate businesses (Swinson even had Kohler employees working on supposed DCE projects). Of course, not knowing that Swinson and DCE were one and the same, Kohler paid DCE's bill— seventeen in all. The precise nature of the procurement process and the mailings will be addressed later.

On November 19, 1991, a federal grand jury indicted Swinson on seventeen counts of mail fraud. The first sixteen alleged the mailing of checks; the seventeenth count alleged the mailing of a purchase order. Unquestionably all but one of the seventeen checks were mailed. According to the testimony of a Kohler employee, Swinson personally picked up one check. Because the employee wasn't sure which check, the prosecution could not certify which count involved a check not mailed. Because of the uncertainty, Swinson moved for an acquittal of the sixteen check mailing counts. In response, the government argued that the witness was referring to the check involved in count seventeen, because that last check was deposited into DCE's bank account the very same day it was issued, and thus not mailed. But because the witness simply did not know which of the seventeen checks was not mailed, rather than permitting the jury to speculate, the court dismissed counts one through sixteen. Count seventeen alleged the mailing of a purchase order, and the court concluded that the prosecution had presented sufficient evidence for the jury to decide that issue.

The jury convicted Swinson, and on July 20, 1992 the court sentenced him to thirty months in prison and three years supervised release. He challenges the propriety of the indictment, the admission of certain business records, and the sufficiency of evidence. Because we conclude that the evidence was insufficient, we need only address that issue.

## II. Analysis

■ The elements of mail fraud and our standard of review are well settled.

[T]he prosecution must establish beyond a reasonable doubt that: (1) the defendant has participated in a scheme to defraud and (2) the defendant has mailed or has knowingly caused another to mail a letter or other matter for the purpose of executing the scheme.... When the defendant questions the sufficiency of the evidence underlying his criminal conviction, it is a well-established principle of federal law that the appellate court will view the facts in the light most favorable to the government.... [T]he standard of review is whether a rational trier of fact could have found from the evidence and inferences

drawn therefrom that the defendant was guilty beyond a reasonable doubt.

*United States v. Brooks,* 748 F.2d 1199, 1202 (7th Cir.1984) (citations omitted). The question before us is whether sufficient evidence shows that Kohler mailed the purchase order to Swinson. *See United States v. Hirschberg,* 988 F.2d 1509, 1516 (7th Cir.1993). Because no one could specifically say that the mailing occurred, the prosecution had to rely on circumstantial evidence. Such evidence often consists of testimony regarding an employer's usual office practices for mailing documents. *United States v. Keplinger,* 776 F.2d 678, 690 (7th Cir.1985); *Brooks,* 748 F.2d at 1203 (office practice is sufficient so long as it excludes all reasonable doubt); *United States v. Ledesma,* 632 F.2d 670, 675 (7th Cir.), *cert. denied,* 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980) (and cases cited). "The inference that the sender acted in accord with its ordinary practice is reasonable, and the absence of a recollection of departure from that practice strengthens the inference that the practice was followed." *Keplinger,* 776 F.2d at 691. That very "recollection of departure" of not mailing one check is what rendered the fatal blow to the check-mailing counts one through sixteen. Count seventeen required proof that a confirming purchase order was mailed.

During trial, before counts one through sixteen were dismissed, Bruce Roblee, senior buyer in the corporate purchasing department, testified for the government as to the usual business practices of Kohler. Obviously the government, during its case in chief, had no idea that only count seventeen would survive to the jury. With regard to the first sixteen counts, the prosecution introduced evidence of Kohler's ordinary business operations. Mr. Roblee testified that after bids were awarded, Kohler used requisitions and purchase orders in procuring goods and services and paying the vendors. In a typical transaction, Swinson, as mill project manager, would sign and submit a requisition to Mr. Roblee for approval. Once Mr. Roblee signed and approved the requisition, he handed it to his secretary (or placed it on her desk). His secretary would then prepare a purchase order by typing the information into Kohler's computer system. Printed out, the purchase order consisted of multiple copies. Kohler kept copies for its file and departments involved; for example, accounts payable, purchasing, and the requisitioner. Routinely, Kohler would *mail* two copies to the vendor. After delivering the goods or completing the services, in order to receive payment the vendor would sign and *return by mail* one copy of the purchase order and retain the other copy for its records. The vendor might also mail its own invoice requesting payment. Once Kohler signified that the goods or services were satisfactory, the accounting department would issue and mail a check. The file folders regarding the first sixteen counts that the government introduced into evidence contained a Kohler requisition for purchase, a Kohler purchase order, an invoice from DCE (which identified the purchase order number), and a canceled check.

Directing our attention to count seventeen (the only count ultimately considered by the jury), on April 25, 1989, Swinson completed a requisition for purchase, awarding a supply contract to DCE. After supposedly complying with the requisition, on May 21, DCE submitted an invoice to Kohler for $57,164. The record shows that both the requisition and invoice were mailed. These mailings unquestionably furthered the fraud. Had they been part of the charge, this would be a different case. Unfortunately, the indictment only concerned itself with a "purchase order." The DCE invoice did not identify a purchase order number because Kohler had not yet assigned one. Because the mill project had gone over budget, Kohler had delayed payment to vendors pending review and several management approvals. Nearly four months later, on September 15, Swinson hand-carried the requisition and invoice to Mr. Roblee for approval. Mr. Roblee assigned a purchase order number authorizing payment, and his secretary composed a *confirming* purchase order (meaning the goods had already been delivered). Did Mr. Roblee's secretary hand Swinson this purchase order or did she mail it to DCE? We do not know because she did not testify. What the record does reflect is that on cross-examination, Mr. Roblee testified that Swinson waited until the confirming purchase order was generated and took out of the office with him

the requisition, the invoice, *and at least parts of the purchase order.* He assumed Swinson was taking the purchase order to accounts payable to get the check issued for payment.[1] The check would be dated the date it was actually issued, in this instance, September 18. The parties do not dispute that Swinson personally picked up the check on September 18 and deposited it that very day. Pursuant to the indictment, to convict under count seventeen the government had to prove that at least part of the purchase order needed to further the fraud was mailed.

The more narrow issue focuses on Kohler's ordinary business practice of mailing documents and whether that practice was followed in this case. During cross-examination, Mr. Roblee testified as follows:

> Question: I understand what may not normally be the case. I assume you wouldn't say it's normal for a requisitioner to come into your office and say I need this $57,000 check or whatever it is right now.
>
> Answer: Correct.
>
> Question: So this whole thing was out of the ordinary.
>
> Answer: ... Yes.

The government recognized this by asking Mr. Roblee, "Do you recall anything *unusual* about this particular purchase order?" (Emphasis added.) If Kohler had followed its usual business practice with regard to count seventeen, the purchase order would have had to have been signed and submitted by DCE to receive payment. But Kohler did not follow its usual business practice; the purchase order was a confirming one. Thus, the fact that Kohler issued a check to DCE is not dispositive of whether the confirming purchase order was mailed.

The government did show that Kohler's usual business practice with regard to confirming purchase orders was to mail the vendor at least one copy. But here again, the evidence does not establish that Kohler fol-

lowed that usual business practice. The facts, in the light most favorable to the government, show that Swinson interrupted Kohler's regular business routine. He waited in Mr. Roblee's office until a confirming purchase order was completed. Swinson handled at least parts of the confirming purchase order and later personally picked up DCE's check. From these facts we cannot infer that Kohler followed its regular business practice of mailing the confirming purchase order to DCE. We thus need to determine whether, notwithstanding Kohler's and Swinson's unusual handling of the purchase order and check, other circumstantial evidence is sufficient to convict.

The government, citing *United States v. Sumnicht,* 823 F.2d 13 (2d Cir.1987), argues that Swinson would not have taken the entire purchase order out of Mr. Roblee's office, contrary to Kohler's usual business practice, in light of the risk that Swinson's actions would raise suspicions and perhaps connect him to DCE. In *Sumnicht* an informant inside Merrill Lynch had disclosed confidential numbers associated with certain financial certificates. The defendant submitted false claim forms to collect interest on the notes. The issue was whether sufficient evidence showed that the claim forms were mailed. The court stated that

> although it might have been convenient for an accomplice within Merrill Lynch to hand-deliver the claims, such an accomplice would not wish to deliver them in a manner that would invite special attention to them, thereby imperiling the success of the scheme. Nor would such an accomplice wish to take the risk of calling attention to his own connection with these claims.

*Id.* at 15. But *Sumnicht* assumed regular business practices were followed. The logical reasoning in that case was that a defendant would invite special attention to his

---

1. There is little evidence in the record on Kohler's usual business practice where a confirming purchase order is involved. On September 15, 1989, Swinson appeared in Mr. Roblee's office with a Kohler requisition attached to a DCE invoice. Mr. Roblee initialed the invoice for approval and assigned it a purchase order number. In response to the government's question as to whether there was any reason why a vendor

would want to pick up a confirming purchase order, Mr. Roblee testified there was not, because the check was already in the process for payment. This implies that once DCE were to receive a confirming purchase order, DCE would not have to submit any additional paperwork to Kohler; the DCE invoice, already approved, was enough for Kohler to issue a check.

actions by acting inconsistently with an employer's usual business practices. However, if the employer is not following the usual practice, and the defendant is already in the midst of unusual circumstances, the risks are completely different.

Mr. Roblee issued a *confirming* purchase order in order to pay DCE. Swinson waited in Mr. Roblee's office until the order was completed. Later Swinson personally picked up DCE's check. All three of these procedures were extraordinary. Giving Swinson DCE's check (as opposed to mailing it or at least giving it to someone officially from DCE) is just as strange as giving him DCE's copies of the purchase order. The government did not present at trial any portion of the purchase order bearing the signature of a DCE representative. Kohler would never know, by its own records, whether the mailing occurred. Because Kohler did not follow its usual business practices, *Sumnicht* does not apply. The government argues that Swinson would not have risked taking the purchase order out of Mr. Roblee's office. But the most that can be inferred from the record is that Swinson indeed took such a risk. The unusual procedure with this confirming purchase order and especially Swinson's personal receipt of the check negate any inference that Swinson would not also risk by-passing the mailing. In referring to DCE's copies of the confirming purchase order, Mr. Roblee testified:

> Question: If Mr. Swinson is DC Engineering and if he's got the purchase orders in his hand including DC Engineering's two copies confirming the yellow one that you talked about and the other one, it makes all the sense in the world he'd have kept them, doesn't it?
>
> Answer: Correct.
>
> Question: And you cannot say that anything was mailed.
>
> Answer: I cannot.

Thus, as factual matter, the record only supports the opposite conclusion. Contrary to the defendant in *Sumnicht*, by being in Mr. Roblee's office and having access to the purchase order, Swinson was in a good position to destroy evidence of his crime or confuse any trail connecting himself and DCE. Whether he kept all of the purchase order or allowed Mr. Roblee's secretary to mail DCE

a few copies we do not know; certainly the question raises reasonable doubt about the mailing that only jury speculation could resolve.

In addition to the requirement of a mailing, the defendant must have used the mails "in furtherance of the scheme" to defraud. *United States v. Bonansinga*, 773 F.2d 166, 168 (7th Cir.1985), *cert. denied*, 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986). Were we to reach this question, a key inquiry would be the timing between when Swinson cashed the fraudulent check and when Kohler would have mailed DCE the confirming purchase order. *United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974) (whether the mailings were closely related to the scheme); *Bonansinga*, 773 F.2d at 170 ("whether the scheme had reached fruition at the time of the charged mailings"). We would also need to examine the nature of the confirming purchase order and whether the mailing was merely fortuitous or "incidental" or whether it was a necessary step to issue the check or at least conceal the scheme. *United States v. McClellan*, 868 F.2d 210, 216 (7th Cir. 1989). But because the evidence in this case does not prove that the purchase order was mailed in the first place, we need not reach the argument.

### III. Conclusion

This could have been an open and shut case—even without the check mailings in the dismissed counts one through sixteen. Count seventeen involved a requisition from Kohler to DCE, an invoice from DCE to Kohler, a purchase order and a check. It was obvious at the outset the check was not mailed. And as we have seen, the purchase order was composed and handled under very unusual circumstances. Perhaps the mailing could have been proven by the testimony of Mr. Roblee's secretary. In any event, it is clear from the record that the requisition and invoice were mailed; but the indictment only concerned itself with the purchase order. Because the prosecution failed to introduce sufficient circumstantial evidence to show that Kohler mailed the purchase order to Swinson, his conviction for mail fraud is RE-

VERSED, and the cause is REMANDED with instructions for the district court to enter a judgment of acquittal.