In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-1960

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TRACY RATLIFF-WHITE,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 10—**James F. Holderman**, *Chief Judge.*

---

ARGUED NOVEMBER 28, 2006—DECIDED JULY 10, 2007

---

Before FLAUM, MANION and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In 2002, Tracy Ratliff-White, a veteran with disabling post-traumatic stress disorder, established a fictitious healthcare company to defraud the government. Ratliff-White and her co-defendant, Dorothy Norwood, bilked the Veterans Administration for $32,100 in companion care services that were never provided. The VA electronically deposited the money into the defendants' bank account, and after the scheme came to light, the defendants were indicted and ultimately convicted of two counts of wire fraud.

Ratliff-White now appeals, contending that her wire fraud convictions must be reversed because the VA deviated from the standard electronic multi-step payment

process charged in the indictment. We understand her to argue that this deviation amounted to a fatal variance between the fraud alleged in the indictment and that proved at trial. But, we disagree. Although Count One pinpointed one step in the July payment process, and the proof established another, that variance was harmless, so we affirm on Count One. We also affirm on Count Two because there was ample evidence that payment instructions were transmitted in August 2002, as charged in that count.

## I. BACKGROUND

In November 2001, Ratliff-White asked Hines Veterans Administration Hospital ("Hines VA") located near Chicago, Illinois to provide her with 24-hour companion care to help cope with recurring flashbacks associated with her post-traumatic stress disorder. Because Hines VA did not have sufficient resources to provide that level of care, it hired or attempted to hire private care-taking companies. Two different companies contracted with the VA to provide companion-care services to Ratliff-White, but finding her a difficult client, both companies terminated their contracts with the VA after one month. A third company declined to provide services after an initial meeting with Ratliff-White, and Hines VA then told her she would have to locate appropriate companion-care services on her own.

In April 2002, Ratliff-White approached Dorothy Norwood, an employee of one of the home health care companies that had previously provided services to Ratliff-White, about forming a care-taking company called Compassionate Home Health Services ("CHHS"). Ratliff-White appointed herself president of CHHS, responsible for hiring employees and handling invoices and employee time sheets, and offered Norwood the position of vice president. Ratliff-White explained that as vice president,

Norwood would handle all communications with Joseph Rio, an administrator at Hines VA, because Rio would recognize Ratliff-White's voice. In return, she promised Norwood a $2,000 monthly salary and access to a company car. After accepting the position, Norwood called Rio at Hines VA, introduced herself as vice president of CHHS and offered to provide companion care services to Ratliff-White at particular hourly rates. Rio agreed to Norwood's terms, and their agreement was memorialized in a contract prepared by Ratliff-White.

Over the next several months, Ratliff-White prepared and Norwood faxed to Hines VA invoices and time sheets purportedly reflecting services performed by CHHS employees. But the individuals identified on the time sheets were never employed by CHHS and no services were ever performed. According to Norwood's daughter, who occasionally assisted in typing invoices and time sheets, Ratliff-White once confided that some of the names on the time sheets were "made-up" and that the services on the time sheets and invoices had not been performed.

Relying on the false time sheets and invoices, in July and August 2002, the VA authorized the electronic transfer of a total of $32,100 to a bank account jointly owned by Ratliff-White, Norwood, and Norwood's daughter. Because several events caused Rio to question CHHS's legitimacy, the VA terminated its contract with CHHS in August 2002. That October, the Office of the Inspector General for the VA searched Ratliff-White's apartment in Aurora, Illinois and found CHHS's bogus time sheets, invoices, and tax-related information.

For their activities, Ratliff-White and Norwood were ultimately indicted for committing mail fraud in violation of 18 U.S.C. § 1343. Count One charged that on or about July 16, 2002, Ratliff-White and Norwood "knowingly caused to be transmitted in interstate commerce from

Hyattsville, Maryland to Dallas, Texas, by means of wire communication . . . payment instructions for $22,470 in funds intended for Compassionate Home Health Services, from the United States Department of the Treasury, Hyattsville, Maryland to the Federal Reserve Bank in Dallas, Texas . . . ." Count Two charged that on or about August 15, 2002, Ratliff-White and Norwood "knowingly caused to be transmitted in interstate commerce from Hyattsville, Maryland to Dallas, Texas by means of wire communication . . . payment instructions for[ ]$9,150 in funds intended for Compassionate Home Health Services, from the United States Department of the Treasury, Hyattsville, Maryland to the Federal Reserve Bank in Dallas, Texas . . . ."

To prove that the transmission of payment instructions had in fact occurred on the dates charged, the government called Alice Merculief, a United States Treasury representative, who explained the standard procedure for electronically depositing funds into the accounts of VA vendors like CHHS. According to Merculief, the VA's processing center in Austin, Texas ("VA Austin") first submitted payment files to the Treasury's mainframe computer in Hyattsville, Maryland ("Treasury Hyattsville") where the payment files were validated. Next, Treasury Hyattsville sent a "pre-edit" report to the Treasury's remote financial center in Austin, Texas ("Treasury Austin"), which certified the payment. Then, Treasury Austin formatted the payment request and transmitted it from the Treasury's mainframe at Treasury Hyattsville to the Federal Reserve Bank in Dallas, Texas ("Federal Reserve Dallas"). Finally, Federal Reserve Dallas ensured the deposit of funds into the appropriate vendor account.

Merculief also authenticated records from the Treasury's database reflecting that, on behalf of the VA, the Treasury had paid CHHS $22,470 on July 16, 2002, and $9,150 on August 15, 2002. Merculief testified that instructions regarding each payment would have been transmitted

from Treasury Hyattsville to Federal Reserve Dallas. She acknowledged, however, that the records did not document the multi-step transmission of payment instructions between VA Austin, Treasury Hyattsville, Treasury Austin, and Federal Reserve Dallas.

Rio testified that the standard procedure was not followed in making the July 16, 2002 payment at issue in Count One. He said that because Norwood represented that she needed to pay CHHS employees right away, "[w]e worked it out what we called paid out of off line, which allowed us to deal with our Finance Department to pay and actually send an electronic payment, which is received within three days, to that particular vendor and that was done . . . ." Rio acknowledged on cross-examination that Hines VA's fiscal department "did not use the usual procedure of notifying the VA's payment center in Austin and having them send the funds." He could not describe the "off line" process in detail, and did not know how Hines VA's fiscal department was able to override the traditional three to four week payment process because it was "not [his] department." Merculief testified that she was not at all familiar with the "off line" process.

The jury also heard testimony that Ratliff-White believes portrayed her as a liar. First, during his testimony, Rio mentioned that Ratliff-White had made prior requests for services from the VA, including a request that the VA pay for her to fly to Arlington, Virginia to attend the alleged funeral of her fiancé. Rio explained that the VA denied that request, finding that there was no one in the military by the name Ratliff-White gave and that no such individual had died or been buried in Arlington. Ratliff-White did not object to this testimony. In addition, the government cross-examined Ratliff-White's treating physician, Dr. Judi A. McInerney, in a manner suggesting that Ratliff-White had fabricated her assault history. The defense objected, saying that the questions as-

sumed matters not in evidence, and the court sustained that objection.

The jury convicted Ratliff-White on both counts, and the court sentenced her to concurrent terms of 21 months' incarceration and three years' supervised release. In addition, she was ordered to make restitution in the amount of $32,100 to VA Hines, an obligation for which she and Norwood were held jointly and severally liable, and to pay a $100 special assessment on each count. Ratliff-White now appeals her convictions.

## II.  ANALYSIS

### A.  Ratliff-White's Sufficiency of the Evidence Challenges

Ratliff-White contends that the resolution of this appeal primarily turns on two questions: (1) whether there is sufficient evidence to support a finding that payment instructions flowed from the Treasury in Hyattsville, Maryland to the Federal Reserve Bank in Dallas, Texas on the dates charged; and (2) whether those transmissions were reasonably foreseeable. If not, she contends, both of her convictions must be vacated.

Defendants shoulder a heavy burden when lodging sufficiency of the evidence challenges. To prevail, Ratliff-White must show that when viewing all the evidence in the light most favorable to the government, no rational trier of fact could have found her guilty of the charges beyond a reasonable doubt. *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006).

A defendant commits wire fraud under 18 U.S.C. § 1343, if she: (1) participates in a scheme to defraud; (2) intends to defraud; and (3) causes a wire transmission in furtherance of the fraudulent scheme. *See* 18 U.S.C.

§ 1343;[1] *United States v. Radziszewski*, 474 F.3d 480, 484-85 (7th Cir. 2007). A defendant can "cause" a wire transmission without personally sending a transmission. *Am. Auto. Accessories, Inc. v. Fishman*, 175 F.3d 534, 542 (7th Cir. 1999); *United States v. Alexander*, 135 F.3d 470, 474 (7th Cir. 1998). One "causes" a wire transmission by acting with the knowledge that use of the wires will occur in the ordinary course of business or where use of the wires can be reasonably foreseen. *Am. Auto. Accessories, Inc.*, 175 F.3d at 542. The first and second elements of wire fraud are not at issue in this case. Ratliff-White maintains only that the government failed to satisfy the third prong, claiming that the evidence established neither the occurrence nor foreseeability of the transmission of payment instructions alleged in Counts One and Two.

## 1.   Sufficiency of the Evidence on Count Two

We start with simplest issue, Ratliff-White's challenge to the sufficiency of the evidence offered to prove the charges alleged in Count Two.

---

[1]  18 U.S.C. § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

### a. *Proof of a Wire Transmission*

Evidence that wire transmissions occur in the usual course of business is ordinarily sufficient to show that a particular wire transmission occurred on a given occasion. *See, e.g.*, *Alexander*, 135 F.3d at 474-75. However, if the defendant counters with evidence that the party deviated from its usual practice, the government can no longer rely on standard procedure evidence to prove that a particular wire transmission occurred. *See, e.g.*, *United States v. Swinson*, 993 F.2d 1299, 1300-02 (7th Cir. 1993).

Here, the government maintains that Alice Merculief's testimony describing the Treasury's standard procedure for processing payments on behalf of the VA proves that instructions for the payment of $9,150 to CHHS flowed from the Treasury in Hyattsville, Maryland to the Federal Reserve Bank in Dallas, Texas on August 15, 2002. We agree. Because there was no evidence of deviation from standard practice as to the August payment, the government's reliance on Merculief's testimony was proper.

### b. *Proof that Ratliff-White Knowingly Caused a Wire Transmission*

A defendant "knowingly causes" another to make a wire transmission if the defendant knows that a wire transmission will occur in the ordinary course of business or where the use of wires could be reasonably foreseen. *See Am. Auto. Accessories, Inc.*, 175 F.3d at 542; *Alexander*, 135 F.3d at 475. Ratliff-White contends that the government failed to prove that the transmission of payment instructions from Hyattsville to Dallas—an admittedly obscure internal procedure—was foreseeable. Her argument misses the mark, however, because she overstates the government's burden.

To satisfy the causation element, the government need only show that the defendant knew that some use of the wires would follow. Our case law does not require that a specific mailing or wire transmission be foreseen. *See Pereira v. United States*, 347 U.S. 1, 8-9 (1954) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used."); *Am. Auto. Accessories, Inc.*, 175 F.3d at 542 ("Appellants need not show that Fishman himself utilized the mail or wire services, but only that he caused the mail or wire services to be used by acting with the knowledge that their use would 'follow in the ordinary course of business, or where such use [could] reasonably be foreseen.'"); *Alexander*, 135 F.3d at 474-75 ("It is not necessary that Alexander himself utilized the mails. It is instead sufficient if he caused the mails to be used, which he would do by acting 'with the knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen.'"); *United States v. Hickok*, 77 F.3d 992, 1004 (7th Cir. 1996) ("The 'use of the mails' element is satisfied if a defendant 'knowingly causes the mails to be used in furtherance of a scheme to defraud.'"); *see also United States v. Pimental*, 380 F.3d 575, 589 (1st Cir. 2004) ("[I]t is simply 'use of the mail' in the course of the scheme rather than the particular mailing at issue that must be reasonably foreseeable for the causation element of a mail fraud offense to be satisfied.").[2]

---

[2] *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993), lends no support to the defendant's argument. That case did not create a rule requiring the government to prove that a defendant foresaw the particular wire transmissions charged in the indictment. There, we simply reiterated that the government

(continued...)

Given that the defendant knew that payments to CHHS would be electronically transmitted to her account, she clearly foresaw that her fraud on the VA would result in wire transmissions. With respect to Count Two, then, the evidence was sufficient to show both that a wire transmission occurred on August 15, 2002, and that Ratliff-White "caused" a wire transmission in further- ance of her scheme on that day.[3]

## 2. Sufficiency of the Evidence on Count One

We turn now to the more difficult question of whether the government offered evidence sufficient to prove the charges alleged in Count One.

### a. *Proof of a Wire Transmission*

As we stated above, evidence that wire transmissions occur in the usual course of business will not show suffi- ciently that a particular wire transmission occurred when the evidence suggests a deviation from usual practice. *See, e.g.*, *Swinson*, 993 F.2d at 1300-02. Just such a deviation occurred on July 16, 2002, when, at CHHS's request for quick payment, the VA transferred funds to Ratliff-

---

[2] (...continued)
must "*prove* that [some] use of the mails was foreseeable," *id.* at 1224, rather than falling back on a general assumption that "the large size and interstate nature of [an organization] demonstrate that something would be dropped into the mails," *id.* at 1223.

[3] Although the defendant received concurrent terms of imprison- ment and supervised release on Counts One and Two, we must nonetheless assess the sufficiency of the evidence on Count One, because each count resulted in a $100 special assessment. *See Ray v. United States*, 481 U.S. 736, 737 (1987) (per curiam).

White's account using a poorly understood "off line" process. Since the VA deviated from its standard practice in order to expedite payment to CHHS, the prosecution could not rely on Merculief's testimony regarding the standard payment procedure to prove that payment instructions were transmitted from Hyattsville, Maryland to Dallas, Texas on July 16, 2002, as alleged in Count One.

Ratliff-White contends that this flaw is fatal to the government's case on Count One, and compels the automatic reversal of the guilty verdict on that count. We do not agree. The defendant's position ignores the foundational question of prejudice. The defendant does not deny that there was a fraud. She admits that wire transmissions—transmissions that furthered the scheme—occurred on the dates charged, stating "[t]here is no dispute that payments were wired from the Federal Reserve Bank in Dallas, Texas to the defendants' bank account. But, for whatever reason, that is not the interstate wire transmission with which Ms. Ratliff-White was charged." Defendant's Reply Br. at 13. And, she unquestionably foresaw (i.e., caused) those wire transmissions, because she, Norwood, and Norwood's daughter established a bank account where they wanted the VA to deposit CHHS's payments. The proof at trial established a glaring violation of the federal wire fraud statute.

Instead of disclaiming participation in a wire fraud, then, the defendant resorts to arguing that the government failed to prove the precise step in the July payment process alleged in Count One. Specifically, we understand the defendant to be contending that she was prejudiced by either a constructive amendment to the indictment or a variance between the indictment and proof at trial. Constructive amendments and variances can imperil a defendant's Fifth Amendment right to be informed of the nature and cause of the accusation against

her and her Sixth Amendment right to indictment by a
grand jury.[4] *See Stirone v. United States*, 361 U.S. 212,
215-16, 217 (1960); *United States v. Pigee*, 197 F.3d 879,
886 (7th Cir. 1999); *United States v. Kuna*, 760 F.2d 813,
817 (7th Cir. 1985).

   A variance between indictment and proof exists "when
the terms of the indictment are unaltered, but the evid-
ence offered at trial proves facts materially different
from those alleged in the indictment." *United States v.
Galiffa*, 734 F.2d 306, 312 (7th Cir. 1984) (citation omit-
ted); *see United States v. Willoughby*, 27 F.3d 263, 265 (7th
Cir. 1994); *Hunter v. New Mexico*, 916 F.2d 595, 598-99
(10th Cir. 1990). "[A] variance is fatal only when the
defendant is prejudiced in his defense because he cannot
anticipate from the indictment what evidence will be
presented against him or is exposed to the risk of double
jeopardy." *Hunter*, 916 F.2d at 599; *United States v. Kuna*,
760 F.2d 813, 819 (7th Cir. 1985).

   A constructive amendment to an indictment:

   > is found where a "complex set of facts" is presented
   > to the jury during the trial which is distinctly
   > different from the set of facts set forth in the
   > charging instrument. Alternatively, to find a
   > constructive amendment the crime charged in the
   > indictment must be "materially different or sub-
   > stantially altered at trial, [so that] it is impossible
   > to know whether the grand jury would have in-
   > dicted for the crime actually proved."

---

[4] To safeguard those constitutional guarantees, the Supreme
Court has long held that "a court cannot permit a defendant to be
tried on charges that are not made in the indictment," *Stirone*,
361 U.S. at 217, and "after an indictment has been returned
its charges may not be broadened through amendment except
by the grand jury itself," *id*. at 215-16.

*Kuna*, 760 F.2d at 818 (citations omitted); *Pigee*, 197 F.3d at 886.

The line distinguishing variances from constructive amendments "essentially is between the situation in which different evidence supports the charged crime [as with a variance] and that in which the evidence supports a crime other than that charged [as with an amendment]." *United States v. Pisello*, 877 F.2d 762, 765 (9th Cir. 1989); *see United States v. Patterson*, 348 F.3d 218, 227 (7th Cir. 2003); *Willoughby*, 27 F.3d at 265-66. While there exists only a "'rather shadowy distinction' between amendments and variances, a finding of one rather than the other achieves a crystal clear difference in result: 'amendments have been held to be prejudicial per se, while variances may be subject to the harmless error rule.'" *Kuna*, 760 F.2d at 817 (citations omitted); *Pisello*, 877 F.2d at 765 ("Although . . . an amendment[ ] requires reversal, . . . a variance[ ] does not warrant reversal unless it affects the substantial rights of the defendant.").

We turn now to that distinction for guidance, looking first at case law on constructive amendments and then at the law of variances. In *Stirone v. United States*, the Supreme Court found a constructive amendment where the indictment charged the defendant only with interfering with the *importation* of *sand*, yet the trial evidence also went to prove a qualitatively different violation of the Hobbs Act—the interference with the *possible exportation* of *steel*. 361 U.S. at 217. Noting that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself," *id.* at 215-16, and that "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him," *id.* at 217, the Court reversed the defendant's conviction, *id.* 219. There was simply no way of knowing whether a grand jury "satisfied to charge that

Stirone's conduct interfered with interstate importation of sand," would have "been willing to charge that Stirone's conduct would interfere with interstate exportation of steel from a mill later to be built . . . ." *Id.* at 217.

By contrast, when confronted with a case resembling this one, the Second Circuit in *United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006), found a variance, not a constructive amendment of the indictment, and affirmed the defendants' convictions for wire fraud and conspiracy to commit wire fraud. *Id.* at 140-41. There, the defendants engaged in an advance fee fraud, whereby they told investors that they were working to release frozen funds owed to the family of former Filipino president Ferdinand Marcos. *Id.* at 135. Investors were promised that in exchange for their $1,000 contributions to the effort to release the funds, they would ultimately receive $500,000. *Id.*

Although the indictment charged that the defendants "caused an investor to wire approximately $2,000 via Western Union from Liberty Township, Ohio to New York, New York," and that fact was not proved at trial, the court nonetheless affirmed the defendants' convictions based on proof unequivocally establishing that other interstate transmissions occurred in furtherance of the scheme. *Id.* at 140 n.10 (emphasis omitted). The court reasoned that:

> the prosecution did not constructively amend Count Two because the evidence at trial concerned the same elaborate scheme to defraud investors as was described in the indictment. The starting and ending dates of the conspiracy noted in the indictment correspond to the conspiracy proven at trial, and the evidence at trial demonstrated that defendants misled investors into believing that defendants would eventually be able to obtain the "frozen funds purportedly belonging to the family

of former Filipino president Ferdinand Marcos" described in the indictment. There was, however, clearly a variance because the particular wire transfer identified in the indictment was not proven at trial.

*Id.* at 140-41; *see also United States v. Momeni*, 991 F.2d 493, 495 (9th Cir. 1993); *Pisello*, 877 F.2d at 765; *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984).

So too here. In this case, the superseding indictment charged that Ratliff-White "knowingly devised, intended to devise, and participated in a scheme to defraud and obtain money from the United States of America, through the Department of Veterans Affairs, by means of materially false and fraudulent pretenses . . . ." In particular, the indictment alleged that from

in or about July 2002 to August 2002, defendant RATLIFF-WHITE and defendant NORWOOD caused the VA to deposit approximately $32,100 in funds representing payment for services purportedly performed by Compassionate Home Health Services into the account that they jointly owned at TCF National Bank, well knowing that Compassionate Home Health Services was a fictitious company and had not provided any such services.

The proof at trial established exactly that. Therefore, we conclude, just as the Second Circuit did in *Dupre*, that "the prosecution did not constructively amend [the indictment] because the evidence at trial concerned the same elaborate scheme to defraud [the United States] as was described in the indictment." *Dupre*, 462 F.3d at 140-41. Further, the starting and ending dates of the scheme noted in the indictment and proved at trial are identical. *See id.* And the evidence adduced at trial showed that, as described in the indictment, the defendant "caused the VA to deposit approximately $32,100 in funds representing

payment for services purportedly performed by Compassionate Home Health Services into the account . . . at TCF National Bank, well knowing that Compassionate Home Health Services . . . had not provided any such services." *See id.*

Moreover, this case presents facts even more compelling than those of *Dupre*. In *Dupre*, the court recognized that the wire transmission actually proved at trial was "not mentioned in the indictment *at all*." *Dupre*, 462 F.3d at 142. But here, the indictment expressly references the wire transmissions proved at trial—deposits totaling $32,100 into the account Ratliff-White shared with Norwood and her daughter. We need not wonder "whether the grand jury would have indicted for the crime actually proved," *Kuna*, 760 F.2d at 818, because it did. And importantly, unlike *Dupre*, this case concerns only one true transfer that involved a particular payer (the VA) and payee (CHHS). Although the indictment anticipated that the transfer would require multiple steps and highlighted one of those steps, the overarching transfer discussed in the indictment was proved at trial. In *Dupre*, however, the transfer charged in the indictment and that proved at trial were completely different as they involved entirely different payers. Finding no constructive amendment of the indictment, we consider whether the facts suggest a fatal variance.

These facts evince a variance between Count One, which pinpointed a particular step in the payment process, and the proof at trial, which established another. But, every instance in which we find a variance between indictment and proof does not require reversal. Indeed, "[a] variance between allegation and proof is not fatal unless the defendant has been thereby deprived of an adequate opportunity to prepare a defense or has been exposed to a risk of being prosecuted twice for the same offense." *Kuna*, 760 F.2d at 819 (citations omitted).

In *Dupre*, the Second Circuit considered that question and found that the proof of a wire transmission different from that alleged in the indictment was not prejudicial. Count Two of the indictment in that case charged that the defendants "caused an investor to wire approximately $2,000 via Western Union from Liberty Township, Ohio to New York, New York." 462 F.3d at 140 n.10 (emphasis omitted). Instead of proving the transfer of $2,000 from Liberty Township, Ohio to New York, New York, however, the Second Circuit found that the evidence at trial established several other wire transfers to the Southern District of New York in furtherance of the fraud, including a $2,000 transfer from Irving, Texas to New York, New York during the period alleged in the indictment. *Id.* at 141.

The court concluded that the defendants were not prejudiced by this variance. First, the court found that the defendants had notice sufficient to defend themselves: "The description of the scheme in the indictment put defendants on notice that the prosecution aimed to prove that defendants conspired in the Southern District of New York to fraudulently induce investors to transfer money by wire to defendants between October 2002 and February 2004." *Id.* at 141. Further, the court reasoned, the defendants could not have been surprised by the evidence used to prove the transfer from Irving, Texas to New York City because, among other things, Federal Rule of Criminal Procedure 16 requires the disclosure of exhibits and witnesses prior to trial. *Id.* The defense also knew that a particular individual would be testifying, and that she possessed certain incriminating documents. *Id.* For those reasons, the court found the defense had every reason to, and did, vigorously cross-examine the witness. *Id.* at 141-42. And, "[n]othing in the record suggest[ed] that the defense would have prepared any differently had the indictment specified a transfer via Western Union of $2,000 from Irving, Texas, instead of a transfer

via Western Union of $2,000 from Liberty Township, Ohio." *Id.* at 142.

Finally, the Second Circuit acknowledged that since the only wire transmission alleged in the indictment was not proved at trial and "[b]ecause neither the prosecution's summation nor the District Court's charge to the jury mentioned what specific transfer was relied upon, [that] neither [the court] nor the defendants [could] know what single act substituted for that enumerated in the indictment." *Id.* at 142. Nonetheless, the court found no prejudice because the district court properly "instructed the jury that it could find defendants guilty of Count Two only if it found them responsible for a fraudulent interstate wire transfer." *Id.* at 142-43; *see United States v. Davis*, 471 F.3d 783, 791 (7th Cir. 2006) ("All that remains is the defendant's argument that the indictment, coupled with inadequate jury instructions, allowed him to be convicted by less than a unanimous jury. . . . Taken in context, the jury was adequately informed of the need for unanimity and that all elements—and at least one scheme—be proved beyond a reasonable doubt. The jury instructions and the inclusion of multiple schemes in a single count did not deprive the defendant of a unanimous jury."); *see also Griffin v. United States*, 502 U.S. 46, 56-57 (1991) ("When a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." (quoting *Turner v. United States*, 396 U.S. 398, 420 (1970)); *United States v. Jones*, 418 F.3d 726, 729-30 (7th Cir. 2005); *United States v. Bond*, 231 F.3d 1075, 1078 (7th Cir. 2000); *United States v. Durman*, 30 F.3d 803, 810 (7th Cir. 1994).

Here, as in *Dupre*, we find that the variance between the indictment and proof at trial was harmless, because the defendant was not deprived of an adequate opportunity to

prepare a defense or exposed to a risk of being prosecuted twice for the same offense. The defendant had notice—the language of the indictment made clear that the prosecution sought to prove that from "July 2002 to August 2002, defendant RATLIFF-WHITE . . . caused the VA to deposit approximately $32,100 in funds representing payment for services purportedly performed by Compassionate Home Health Services into the account . . . at TCF National Bank, well knowing that Compassionate Home Health Services . . . had not provided any such services." *See Dupre*, 462 F.3d at 141. Additionally, the defendant could not have been surprised by the evidence showing the electronic transfer of funds to her bank account on July 16, 2002. Pursuant to Federal Rule of Criminal Procedure 16 and Northern District of Illinois Local Rule 16.1, the prosecution disclosed exhibits to the defendant before trial. *Id.* So, the defense was advised that the prosecution would be proffering documents to prove the interstate wire transmission of funds into Ratliff-White's shared account. And, perhaps most importantly, Ratliff-White's counsel cannot show that she would have conducted the defense case any differently had the indictment been drafted more artfully to charge only the deposit of $22,470 on July 16, 2002, rather than the transmission of payment instructions between Hyattsville and Dallas. Given that the defendant concedes "that payments were wired from the Federal Reserve Bank in Dallas, Texas to the defendants' bank account," what defense she might have offered is wholly unclear. *Id.* at 142 ("Nothing in the record suggest[ed] that the defense would have prepared any differently had the indictment specified a transfer via Western Union of $2,000 from Irving, Texas, instead of a transfer via Western Union of $2,000 from Liberty Township, Ohio.").

Further, the jury instructions alleviate concern that the jury convicted on less than a unanimous verdict.

Specifically, the jury was properly instructed that to convict it had to reach a unanimous verdict and find each element of wire fraud, including the existence of a charged wire transfer, beyond a reasonable doubt. *Dupre*, 462 F.3d at 142-43 (The district court "instructed the jury it could find defendants guilty of Count Two only if it found them responsible for a fraudulent interstate wire transfer."); *see Davis*, 471 F.3d at 790-91.

Finally, affirming Ratliff-White's conviction on Count One does not give rise to a possible double jeopardy claim. The indictment alleged a specific fraud—one that: (1) occurred during a finite interval, "from in or about July 2002 to August 2002"; (2) involved a particular perpetrator and victim, Ratliff-White and the VA, respectively; and (3) alleged specific misconduct by the perpetrator, "caus[ing] the VA to deposit approximately $32,100 in funds representing payment for services purportedly performed by Compassionate Home Health Services into the account . . . at TCF National Bank, well knowing that Compassionate Home Health Services was a fictitious company and had not provided any such services." The indictment also specified the particular wire transmissions at issue—the deposit of a total of $32,100 into Ratliff-White's account, and the transmission of payment instructions from Hyattsville, Maryland to Dallas, Texas on July 16, 2002 and August 15, 2002. We perceive no difficulty in judging the scope of the conviction for double jeopardy purposes. *See Dupre*, 462 F.3d at 143 n.12. For all the above reasons, we find that any variance between the language of Count One and the proof at trial was harmless.[5]

----

[5] To reach a different conclusion would be to parse the language of the indictment and read it in a highly technical manner, two

(continued...)

### b. *Proof that Ratliff-White Knowingly Caused a Wire Transmission*

Having concluded that there was sufficient evidence to show that a wire transmission charged in Count One in fact occurred, the final question is whether Ratliff-White foresaw any wire transmission associated with the fraud alleged in Count One. For the same reasons we found that the government satisfied its burden of proving that Ratliff-White foresaw the use of the wires in furtherance of the wire fraud alleged in Count Two, we find that she foresaw a wire transmission in connection with the charges in Count One.

---

[5] (...continued)

things that we are loath to do. *See United States v. Palumbo Bros.*, 145 F.3d 850, 860 (7th Cir. 1998); *United States v. Mosley*, 786 F.2d 1330, 1334 (7th Cir. 1986); *United States v. Esposito*, 771 F.2d 283, 289 (7th Cir. 1985).

Additionally, we note that this case is distinguishable from *United States v. Swinson*, 993 F.2d 1299 (7th Cir. 1993), in which we reversed a defendant's conviction for mail fraud even though the evidence showed "that [a] requisition and invoice were mailed" in furtherance of the alleged scheme. *Id.* at 1303. There, we reversed for the simple reason that the indictment "*only* concerned itself with the purchase order." *Id.* at 1303 (emphasis added). Indeed, in that case, the indictment did not even reference a requisition or invoice. To have affirmed the conviction because there was sufficient evidence that two documents not even hinted at in the indictment were mailed would have deprived the defendant of his constitutional right to notice of the charges against which he must defend. Our facts do not present such a notice problem. *See United States v. Lovett*, 811 F.2d 979, 986 (7th Cir. 1987) ("Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." (citations omitted)).

## B. Ratliff-White's Challenges to the Purported Admission of Bad Acts Evidence

On appeal, for the first time, Ratliff-White argues that her convictions are the result of the prosecution's introduction of improper propensity evidence in violation of Federal Rule of Evidence 404(b). Specifically, she contends that the prosecution revealed bad acts evidence when it asked Dr. McInerney whether she would have reached a different opinion of Ratliff-White had she known that Ratliff-White's medical history was not as represented. For instance, the prosecution asked whether it would alter Dr. McInerney's opinion to know that the defendant had not actually undergone reconstructive surgery after a violent assault, as she had claimed. Further, Ratliff-White takes issue with the prosecution's questioning Rio about Ratliff-White's prior requests for VA funding. Rio revealed that Ratliff-White had once asked the VA to pay for her to travel to Arlington for her fiancé's burial, and that the VA could not find anyone matching the alleged fiancé's description. According to Ratliff-White, both lines of questioning portrayed her as a liar in violation of Rule 404(b), which provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Before addressing the merits of Ratliff-White's argument, we consider the standard of review governing these evidentiary issues. Although Ratliff-White did not timely object on Rule 404(b) grounds to the lines of questioning at issue today, she nonetheless argues for something other than plain error review. *See United States v. Curtis*, 280 F.3d 798, 801 (7th Cir. 2002) (when a defendant fails to timely object at trial to the admission of evidence, plain error review applies on appeal). Ratliff-White contends that the prosecution violated its Rule 404(b) duty to provide her with advanced notice of its intent to proffer bad act evidence. *Cf. United States v. Carrasco*, 381 F.3d 1237, 1241 (11th Cir. 2004) (per curiam) (reversing a defendant's conviction because the prosecution's failure to give "the required Rule 404(b) notice" before offering evidence of the defendant's prior drug deals "prejudiced [the defendant]'s ability to defend himself"). The prosecution does not dispute that it had a duty to disclose Rule 404(b) evidence or that it failed to satisfy that duty. Ratliff-White argues that as a consequence of the government's nondisclosure, the government should be prevented from calling for plain error review and her failure to object should be excused.[6] Even if we were to accept her novel argument and review for abuse of discretion, which we do not, her claims would still fail. *See United States v. Williams*, 216 F.3d 611, 614 (7th Cir. 2000) ("We

---

[6] Ratliff-White also argues for something other than plain error review because she contends that in questioning Dr. McInerney, the prosecution violated Federal Rule of Evidence 703 and the prohibition against hearsay by introducing material from another expert's report without first allowing the court to assess whether the material's probative value substantially outweighed its prejudicial effect. But as we will explain, even if we were to honor her request for a more favorable standard of review, she would not prevail.

review rulings determining the admissibility of evidence under Rule 404(b) for an abuse of discretion.").

Whether the district court erred in allowing this questioning is immaterial because any error was harmless. *See* Fed. R. Crim. P. 52(a); *United States v. Ortiz*, 474 F.3d 976, 982 (7th Cir. 2007) ("Errors do not merit reversal when the government proves that they are harmless, that is, that they did not affect the outcome of the trial."). The evidence offered in support of Ratliff-White's wire fraud was substantial. Norwood's testimony revealed that Ratliff-White conceived of and directed the fraudulent scheme; recruited others, including Norwood and Norwood's daughter to assist; and prepared all the false time sheets and invoices. Rio and another VA employee testified that Ratliff-White hounded them to make payments to CHHS. Officials involved in the October 2002 search of Ratliff-White's apartment testified about the CHHS time sheets and tax information found in her home and on her personal computer. Merculief testified regarding the standard procedure by which vendor payments were processed by the VA, which included the transmission of payment instructions from Hyattsville, Maryland and Dallas, Texas. Ratliff-White gave us no reason to doubt that the standard procedure was followed on August 15, 2002, and all evidence shows that the standard procedure was followed on that day, as alleged in Count Two. Although evidence exists that there was a deviation from standard practice on July 16, 2002, there is ample evidence of the other wire transmissions charged in the indictment—the deposits totaling $32,100. Indeed, Merculief authenticated documents reflecting the electronic deposit of $22,470 on July 16, 2002, and of $9,150 on August 15, 2002; and Ratliff-White acknowledged that those deposits occurred. Given the ample evidence of wire fraud, we find that any error due to the admission of Rule 404(b) evidence was harmless.

The defendant, however, likens this case to *United States v. Meeker*, 558 F.2d 387 (7th Cir. 1977), where we found that questions posed by the prosecution were sufficient to deprive a defendant accused of failing to report income on his tax returns of a fair trial. *Id.* at 388. That case presented a unique circumstance: (1) the prosecutor's questions "invited the jury to convict Meeker on facts outside the record, some of which were patently untrue, and others of which were not admissible at trial"; (2) the questions gave the jury the false impression that the defendant had in the past committed the very crime for which he stood trial; and (3) the prosecutor's "misconduct was pronounced and persistent . . . ." *Id.* at 389-90 (quotation marks and citations omitted).

This case is distinguishable from *Meeker* in several important respects. The defendant does not suggest that there was no factual basis for the questions asked of Dr. McInerney or that any of the questions suggested facts that were patently untrue. Rio's testimony reveals that there was a factual basis for the questions posed to him. Also, in this instance, the prosecution's alleged misconduct was not repeated. The prosecution did not ignore any warning regarding its questioning of Dr. McInerney, and the defendant only objected to one of the questions asked of Dr. McInerney. After the court sustained that objection, the government refrained from asking objectionable questions. Neither the defendant nor the court expressed any concern regarding the questions posed to Rio. Finally, with respect to Dr. McInerney, it seems clear that the defense put Ratliff-White's assault history in issue by asking Dr. McInerney questions regarding Ratliff-White's accounts of abuse, which opened the door for the government to ask questions about that assault history. Therefore, the defendant's reliance on *United States v. Meeker* is not persuasive.

## III. CONCLUSION

For these reasons, Ratliff-White's convictions are AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*